THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

BELCARO GROUP, INC. d/b/a SHOPATHOME.COM, a Colorado corporation,

    Plaintiff,

v.

QUIBIDS LLC, an Oklahoma limited liability company,
QUIBIDS HOLDINGS LLC, a Delaware limited liability company,
YTZ INTERNATIONAL INC. f/k/a PPX and a/k/a WSF MONETIZATION, a Canada corporation, and
RAPID RESPONSE MARKETING LLC f/k/a XY7.COM and a/k/a XY7ELITE.COM, a Nevada limited liability company.

    Defendants.

---

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES;
JURY DEMAND**

---

Plaintiff Belcaro Group, Inc. d/b/a ShoptAtHome.com ("SAH"), by and through its attorneys Jennifer Golinveaux (previously admitted under D.Colo.L.Civ.R. 83.3) and Fairfield and Woods, P.C., hereby complains against QuiBids LLC, QuiBids Holdings LLC (collectively "QuiBids"), YTZ International Inc., formerly known as PPX and also known as WSF Monetization ("YTZ"), and Rapid Response Marketing LLC, formerly known as XY7.com and also known as XY7Elite.com ("RRM") as follows:

**INTRODUCTION**

1.    This action arises from QuiBids' ongoing threats of litigation against SAH. QuiBids has made repeated threats against SAH, claiming that it fails to disclose certain of its services adequately, and has threatened to sue SAH for fraud and various other claims including violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). In light of these ongoing threats, SAH seeks a declaration that it did not violate any of QuiBids' rights and that

the services about which QuiBids complains are fully lawful. SAH also seeks a declaration regarding the duty of QuiBids' agents, YTZ and RRM, to indemnify SAH regarding this dispute; asserts claims of express/contractual indemnity against YTZ and RRM for their failure to acknowledge their contractual indemnification obligations; and asserts claims against QuiBids for wrongfully interfering with SAH's contract with QuiBids' agent Turn Two Media, LLC ("Turn Two Media").

## PARTIES

2.  SAH is a Colorado corporation with its principal place of business in Greenwood Village, Colorado.

3.  Defendant QuiBids LLC is a limited liability company organized under the laws of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.

4.  Defendant QuiBids Holdings LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Oklahoma City, Oklahoma.[1]

5.  On information and belief, Defendant YTZ International Inc. f/k/a PPX and a/k/a WSF Monetization is a company located and existing under the laws of Toronto, Canada.

---

[1] QuiBids has been sued for fraudulent activity in at least eight cases in the last several years, including in four separate class action lawsuits involving allegations of misleading advertisements, failure to disclose bidding procedures, and claims related to QuiBids' involvement in illegal gambling enterprises and other related claims. *See e.g., Brock v. QuiBids LLC et al.*, filed 7/26/12, Case No. 8:12-CV-01216, C.D. Cal. (the plaintiffs filed class action alleging QuiBids' website contains false and misleading advertisements); *Hertzog et al. v. QuiBids LLC et al.*, filed 7/6/12, Case No. 5:12-CV-00786, W.D. Ok. (the plaintiffs filed class action alleging that QuiBids is involved with illegal gambling enterprises); *Brock v. QuiBids LLC*, filed 6/20/12, Case No. 30-2012-00578561-CU-MT-CXC, Orange County Super. Court (the plaintiffs filed class action contending that QuiBids LLC falsely advertises and engages in unfair business practices relating to hidden costs and profits on its website); *United States et al. v. QuiBids LLC et al.*, filed 8/5/11, Case No. 2:11-CV-01299, W.D. Wash. (the plaintiffs alleged claims against QuiBids for RICO violations and illegal gambling); *Bryant et al. v. QuiBids LLC et al.*, filed 2/11/11, Case No. 1:11-CV-01013, N.D. Ill. (the plaintiff alleged fraud against QuiBids for internet gambling "penny auctions" website); and *Locke v. QuiBids, LLC*, filed 11/30/10, Case No. 5:10-CV-01277, W.D. Ok. (the plaintiffs filed class action claiming fraud against QuiBids for failing to disclose material facts about bidding).

6. Defendant Rapid Response Marketing, LLC is a limited liability company organized under the laws of Nevada with its principal place of business in Las Vegas, Nevada.

## JURISDICTION AND VENUE

7. This case arises under federal law, including under 28 U.S.C. § 1331, because it requires resolution of threatened claims under the CFAA and under the Declaratory Judgment Act of 28 U.S.C. § 2201. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same case or controversy.

8. Venue and jurisdiction are proper in this District because the agreements under which this dispute arises, and to which YTZ and RRM agreed on behalf of itself and as an agent for QuiBids, provide:

> **Governance.** The laws of Colorado and applicable federal U.S. laws shall govern this Agreement. The parties agree that any claims, legal proceedings or litigation arising in connection with the Agreement will be brought solely in the state and federal courts located in Denver, Colorado and the parties consent to the jurisdiction of such courts. The parties further agree that service of process may be made by certified mail.

A true, accurate, and complete copy of the Master Terms and Conditions Agreement between SAH and YTZ ("YTZ Master Agreement") is attached as Exhibit 1; and a true, accurate, and complete copy of the Master Terms and Conditions Agreement between SAH and RRM ("RRM Master Agreement") (collectively, the "Master Agreements") is attached as Exhibit 2.

9. Therefore, this Court has personal jurisdiction over QuiBids, RRM, and YTZ by virtue of their express contractual agreements and, on information and belief, by virtue of their transacting, operating, and soliciting business in this District.

10. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the action occurred in this District.

6. Defendant Rapid Response Marketing, LLC is a limited liability company organized under the laws of Nevada with its principal place of business in Las Vegas, Nevada.

## JURISDICTION AND VENUE

7. This case arises under federal law, including under 28 U.S.C. § 1331, because it requires resolution of threatened claims under the CFAA and under the Declaratory Judgment Act of 28 U.S.C. § 2201. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same case or controversy.

8. Venue and jurisdiction are proper in this District because the agreements under which this dispute arises, and to which YTZ and RRM agreed on behalf of itself and as an agent for QuiBids, provide:

> **Governance.** The laws of Colorado and applicable federal U.S. laws shall govern this Agreement. The parties agree that any claims, legal proceedings or litigation arising in connection with the Agreement will be brought solely in the state and federal courts located in Denver, Colorado and the parties consent to the jurisdiction of such courts. The parties further agree that service of process may be made by certified mail.

A true, accurate, and complete copy of the Master Terms and Conditions Agreement between SAH and YTZ ("YTZ Master Agreement") is attached as Exhibit 1; and a true, accurate, and complete copy of the Master Terms and Conditions Agreement between SAH and RRM ("RRM Master Agreement") (collectively, the "Master Agreements") is attached as Exhibit 2.

9. Therefore, this Court has personal jurisdiction over QuiBids, RRM, and YTZ by virtue of their express contractual agreements and, on information and belief, by virtue of their transacting, operating, and soliciting business in this District.

10. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the action occurred in this District.

## FACTUAL ALLEGATIONS RELATED TO ALL CLAIMS

### SAH's Services

11.     Founded in 1986 by husband and wife team Marc and Claudia Braunstein, SAH is an online loyalty site for online shoppers. It enters into marketing agreements with networks, agents, and merchants to promote certain content and offers cash rebates for some online purchases to members who meet certain eligibility criteria.

12.     SAH, employing more than 100 Colorado residents, provides advertisers with value by exposing and promoting them to SAH's loyal membership base. SAH provides its promotional services to some of the most prominent online retailers in the world. Users may go to SAH to search for a merchant or product and look for coupons, deals, or sales. By partnering with thousands of online retailers, catalogs, and magazines, SAH fulfills its mission of offering the latest products and deals for consumers who shop online while generating targeted leads and product sales for the direct response industry.

### SAH's Services On Behalf of QuiBids

13.     QuiBids is an online retail website that operates as a bidding fee auction, also known as a penny auction.

14.     Since at least October 2010, SAH has advertised on behalf of QuiBids through agreements entered into by third parties including YTZ, RRM, and Turn Two Media, who, on information and belief, were acting as agents for QuiBids regarding the provision of affiliate marketing services.

15.     On or about September 13, 2010, Turn Two Media and SAH executed a "Master Terms and Conditions" agreement (the "Turn Two Media Master Agreement") whereby SAH agreed to promote Turn Two Media's offers, including offers for which Turn Two Media was

4

"acting on behalf of third party advertising agencies, marketers, and others." A true, accurate, and complete copy of the Turn Two Media Master Agreement is attached as Exhibit 3.

16. On or about September 26, 2010, RRM and SAH executed the RRM Master Agreement, whereby SAH agreed to promote RRM's offers, including offers for which RRM was "acting on behalf of third party advertising agencies, marketers, and others."

17. On or about November 16, 2010, YTZ and SAH executed the YTZ Master Agreement, whereby SAH agreed to promote YTZ's offers, including offers for which YTZ was "acting on behalf of third party advertising agencies, marketers, and others."

18. On information and belief, since at least 2010, Turn Two Media, RRM, and YTZ have made offers available to SAH on behalf of QuiBids. In or around November 2012, Turn Two Media deactivated its QuiBids offer for SAH. YTZ continued to make offers available to SAH on behalf of QuiBids until in or around March 2013.

### This Dispute

19. On information and belief, QuiBids began accusing SAH of fraud in or around January 2013. In March 2013, SAH learned that QuiBids was claiming that certain of SAH's products and services, and in particular the redirect feature of its Toolbar, were fraudulent because SAH failed to adequately disclose those services in its contracts and terms. QuiBids also claimed that the alleged inadequate disclosures amounted to SAH unlawfully accessing certain computers in violation of the CFAA. QuiBids ultimately demanded that SAH immediately pay QuiBids millions of dollars or QuiBids would bring legal action.

20. Contrary to QuiBids' assertions, SAH fully disclosed its products and services in its contracts and terms, including in the Master Agreements, and Turn Two Media, RRM, and YTZ were all aware of the features about which QuiBids now complains. QuiBids' allegations

5

are thus not the result of any actual violations by SAH under any reasonable interpretation of the law, but instead are part of a scheme undertaken by QuiBids in an apparent effort to avoid its own contractual obligations and cause SAH to pay an unwarranted amount to settle the dispute.

21.  There is a real and actual controversy between SAH and QuiBids regarding whether SAH has violated any law. QuiBids' baseless accusations threaten to cause irreparable damage to SAH's reputation and business relationships, which SAH has rightfully earned through its 26-year history by providing valuable services to advertisers and its members.

22.  Turn Two Media refused to pay a portion of an outstanding invoice dated September 2012. Specifically, it refused to pay approximately $13,650.00 of the total $17,500.05 invoiced for that month. In or around January 2013, SAH received an email from Turn Two Media indicating that Turn Two Media was "currently holding [SAH's] payment on the [QuiBids] offer." On information and belief, QuiBids was refusing to pay Turn Two Media for SAH's services because of what QuiBids claimed to be fraudulent activity by SAH. Neither QuiBids nor Turn Two Media provided any documentation of the purported "fraud" at the time Turn Two Media refused to pay the September 2012 invoice. Turn Two Media informed SAH that it would only pay the outstanding amount of the invoice if it received payment from QuiBids.

23.  In or around March 2013, SAH learned that QuiBids' refusal to pay Turn Two Media, and thus Turn Two Media's refusal to pay SAH, was allegedly based on the functionality of SAH's Toolbar. Specifically, QuiBids claimed that certain functionality of SAH's Toolbar routed traffic through SAH's website without proper disclosures, and that at times SAH was redirecting Internet traffic intended for QuiBids to QuiBids' competitors. Both of these claims lack merit.

## SAH's Toolbar Application

24.     SAH's Toolbar is a browser application that SAH offers to its members for download which offers a number of features. Relevant to this dispute, when a member who has chosen to download SAH's Toolbar types in the URL of an SAH affiliate store or clicks a link to an affiliate store, SAH will redirect the member through the SAH website to the affiliate store, and a "slider" or alert typically appears to alert the member to deals, coupons, sales, or cash back that may be available. SAH members knowingly download the Toolbar, and must agree to the End-user License Agreement ("EULA") in order to do so. Members who download the Toolbar have already registered with SAH and provided their email and affirmatively agreed to the Terms and Conditions on ShopAtHome.com.

25.     The redirect procedures are disclosed in the Master Agreements and in SAH's EULA, and similar features are used by others in the affiliate marketing industry.

26.     The redirect functionality of SAH's Toolbar is prominently disclosed in the Master Agreements with Turn Two Media, RRM, and YTZ, which state:

> **Toolbar.** Advertiser acknowledges that [SAH] has a downloadable toolbar application ("Toolbar") which users choose to download for, among other things, using the Toolbar Search Box for identifying coupons and cash back offers available on [SAH's] web site, for being alerted to time-sensitive promotions and web site specials, and for the convenience of the Toolbar redirecting the users to the user's selected Offer via [SAH's] site. Advertiser, on behalf of itself and the Marketers, hereby approves [SAH's] use of the Toolbar to promote the Offers. See http://www.shopathome.com/pages/end-user-license-agreement.aspx for the Toolbar EULA.

27.     The Master Agreements reference the EULA, which states as follows in Section 1:

> When you visit a website, whether typing in the URL or clicking a link (including from a search engine results page), the Browser App recognizes whether the URL is that of an Affiliate Store, and, if so, may redirect you through the affiliate network site to the Affiliate Store's website, at which time, a tracking cookie will

>be placed in your browser. This cookie is the tracking mechanism that will follow your transaction with the Affiliate Store, to allow for credit of Cash Back Rewards.

A true, accurate, and complete copy of the EULA is attached as Exhibit 4.

28. In addition to these disclosures, between 2010 and 2012 an SAH Account Executive had discussions with Turn Two Media and YTZ about the redirect functionality of the Toolbar. The Account Executive also performed live demonstrations of the Toolbar's functionality for Turn Two Media and YTZ. Moreover, YTZ touts on its website the fact it has been "work[ing] with redirect traffic" for "over 5 years," suggesting that it is familiar with and understands SAH's redirect features. At no time did SAH attempt to conceal the redirect functionality of the Toolbar.

29. QuiBids has acknowledged to SAH that the EULA, which is expressly referenced in the Master Agreement, discloses the redirect functionality of the Toolbar. It claims, however, that the disclosures state that the redirect functionality is applicable only to "Affiliate Stores." QuiBids claims that it is not an "Affiliate Store." But QuiBids falls squarely within the definition of "Affiliate Stores" contained in the Terms and Conditions on ShopAtHome.com, which define "Affiliate Stores" as "[t]he businesses that participate in the ShopAtHome.com program by compensating ShopAtHome.com on a transactional basis." Indeed, QuiBids is a "business that participates" in SAH's program and compensates SAH for its affiliate marketing on a transactional basis, as it paid SAH through Turn Two Media, RRM, and YTZ, based on conversions, on a cost per action ("CPA") basis. A true, accurate, and complete copy of the Terms and Conditions on ShopAtHome.com is attached as Exhibit 5.

30. QuiBids has also accused SAH of redirecting traffic from quibids.com to competitors' websites. Any such redirection, to the extent that it happened, was not done at the direction of SAH.

### YTZ and RRM Fail To Comply With and Acknowledge Their Obligation To Indemnify SAH

31. Not only do the Master Agreements disclose the redirect functionality of the Toolbar about which QuiBids now complains, YTZ and RRM agreed in the Master Agreements to indemnify SAH if a dispute about the affiliate marketing procedures arose. Specifically, YTZ and RRM are the "Advertiser[s]" as defined in the Master Agreements, in which Paragraph 8 provides:

> **Indemnification:** Advertiser agrees to defend, indemnify and hold harmless [SAH] and its officers, directors, employees and agents from any and all claims, losses, liabilities, damages, costs and expense of any nature (including reasonable attorneys fees) relating to or arising out of (a) the promotion and distribution of the Offers; (b) any and all copy and images supplied by Advertiser and [SAH's] use thereof; and (c) Advertiser's breach of this Agreement.

32. Following QuiBids' threats of litigation, SAH requested that YTZ and RRM honor their express indemnity obligations. To date, YTZ and RRM have failed to confirm their intent to indemnify SAH, thereby refusing to honor their contractual obligations under the Master Agreements.

### FIRST CLAIM FOR RELIEF
### Declaratory Relief Re Non-Violation Of QuiBids' Rights
### (Against QuiBids)

33. SAH repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs as though fully set forth in this claim.

34. As a result of QuiBids' threatened litigation, there is a real and actual controversy

between SAH and QuiBids as to the parties' rights and obligations associated with SAH's affiliate marketing program.

35. Specifically, QuiBids has threatened to file suit alleging the following claims in connection with the redirect feature of SAH's Toolbar: fraud, deceit, negligence, negligence per se, unjust enrichment, restitution, money had and received, disgorgement, tortious interference, malicious wrong, conversion, equitable estoppel, 18 U.S.C. § 1030 (CFAA), 15 O.S. §§ 751-765 (Oklahoma Consumer Protection Act), punitive damages, declaratory judgment, and injunctive relief.

36. Considering all circumstances, including but not limited to the current business environment in which SAH operates, the controversy between the parties is substantial and adversely affects both parties' legal interests in a manner that is both real and immediate.

37. Furthermore, SAH has a reasonable apprehension that it faces future litigation brought by QuiBids. On information and belief, QuiBids has been accusing SAH of fraud since January 2013. But SAH does not know the actual timing of any potential litigation on the part of QuiBids.

38. SAH seeks a judicial determination as to the parties' rights and obligations in connection with this dispute about SAH's affiliate marketing procedures, and a determination that SAH has not committed any torts against QuiBids or violated the CFAA or any related statutes.

39. A judicial declaration is necessary and appropriate at this time so that the parties may understand their obligations and conduct themselves accordingly.

## SECOND CLAIM FOR RELIEF
### Express/Contractual Indemnity
### (Against YTZ and RRM)

40. SAH repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs as though fully set forth in this claim.

41. Within the Master Agreements, YTZ and RRM have entered valid indemnity agreements with SAH that cover this dispute, including the claims threatened by QuiBids.

42. Despite SAH seeking indemnification from YTZ and RRM in connection with this dispute, YTZ and RRM have failed to honor SAH's request for them to comply with their contractual obligations.

43. SAH denies that it is liable for any of the alleged events and/or occurrences and/or damages about which QuiBids has accused SAH. But if SAH is held liable for the injuries and damages alleged by QuiBids, YTZ and RRM's express agreements to indemnify SAH, as set forth in paragraph 8 of the Master Agreements, apply.

## THIRD CLAIM FOR RELIEF
### Declaratory Relief Re Obligation to Indemnify SAH
### (Against YTZ and RRM)

44. SAH repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs as though fully set forth in this claim.

45. YTZ and RRM expressly agreed to indemnify SAH in connection with this dispute, but to date have refused to do so.

46. As a result of QuiBids' threatened litigation, there is a real and actual controversy between SAH and YTZ, and between SAH and RRM, as to the parties' rights and obligations associated with indemnifying SAH in connection with this dispute.

47.     Considering all circumstances, including but not limited to the current business environment in which SAH operates, the controversy between the parties is substantial and adversely affects both parties' legal interests in a manner that is both real and immediate.

48.     SAH seeks a judicial determination that YTZ and RRM must indemnify SAH in connection with this dispute.

49.     A judicial declaration is necessary and appropriate at this time so that the parties may understand their obligations and conduct themselves accordingly.

**FOURTH CLAIM FOR RELIEF**
**Tortious Interference With Contract**
**(Against QuiBids)**

50.     SAH repeats, realleges, and incorporates each and every allegation of the foregoing paragraphs as though fully set forth in this claim.

51.     The Turn Two Media Master Agreement is valid and enforceable.  The Turn Two Media Master Agreement requires Turn Two Media to compensate SAH in accordance with the agreed-to CPA system.

52.     On information and belief, QuiBids is aware of this contractual relationship and prior to November 2012, paid Turn Two Media in accordance with the Master Agreement.  In turn, Turn Two Media would use such payments from QuiBids to compensate SAH.

53.     On information and belief, this changed in or about November 2012, when QuiBids began withholding the CPA payments owed to Turn Two Media, which resulted in Turn Two Media breaching the Turn Two Media Master Agreement by refusing to pay SAH as required.

54. On information and belief, QuiBids intentionally, tortiously, and unjustly induced Turn Two Media to breach the Turn Two Media Master Agreement by refusing to pay Turn Two Media in accordance with the Turn Two Media Master Agreement.

55. On information and belief, QuiBids wrongfully interfered with SAH's Master Agreement with Turn Two Media by withholding payment to Turn Two Media and falsely telling Turn Two Media that SAH had committed fraud, which induced Turn Two Media to breach the Turn Two Media Master Agreement.

56. SAH has been damaged as a result of QuiBids' conduct.

57. QuiBids' interference was and is willful, wanton, and in disregard of the SAH's rights.

58. Wherefore, SAH prays for the following relief set out below.

## **PRAYER FOR RELIEF**

WHEREFORE SAH requests:

a. That the Court declare that SAH's affiliate marketing procedures were agreed to and do not give rise to any liability to QuiBids;

b. That the Court declare that YTZ and RRM must indemnify SAH in connection with this dispute;

c. That SAH be awarded damages for QuiBids' tortious interference with Turn Two Media's Master Agreement with SAH;

d. That SAH be awarded its damages, reasonable costs, disbursements, interest, and attorneys' fees to the extent permitted by law; and

e. That SAH be awarded such other further relief as is just and equitable.

## JURY DEMAND

SAH demands trial by jury of all issues triable by a jury.

Dated this 3rd Day of June, 2013.

>Jennifer A. Golinveaux
>**WINSTON & STRAWN LLP**
>101 California Street
>San Francisco, CA 94111
>jgolinveaux@winston.com
>(415) 591-1506 (Telephone)
>(415) 591-1400 (Facsimile)
>
>FAIRFIELD AND WOODS, P.C.
>
>By:   *s/ John M. Tanner*
>          John M. Tanner
>John M. Tanner
>1700 Lincoln Street, Suite 2400
>Denver, CO 80203-4524
>Telephone: (303) 830-2400
>Facsimile: (303) 830-1033
>Email: jtanner@fwlaw.com
>
>Attorneys for Plaintiff
>BELCARO GROUP, INC., d/b/a
>SHOPATHOME.COM
>5575 DTC Parkway
>Suite 300
>Greenwood Village, CO 80130