**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-cv-1424-MSK

BELCARO GROUP, INC. d/b/a SHOPATHOME.COM, a Colorado corporation,

      Plaintiff,

v.

QUIBIDS, LLC, an Oklahoma limited liability company,
QUIBIDS HOLDINGS LLC, a Delaware limited liability company,
YTZ INTERNATIONAL INC., f/k/a PPX and a/k/a WSF MONETIZATION, a Canada corporation, and
RAPID RESPONSE MARKETING LLC, f/k/a XY7.COM and a/k/a XY7ELITE.COM, a Nevada limited liability company,

      Defendants.

---

**DEFENDANTS QUIBIDS LLC'S AND QUIBIDS HOLDINGS LLC'S**
**MOTION TO DISMISS FOR WANT OF PERSONAL JURISDICTION AND FOR**
**FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

---

      Pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6), Defendants QuiBids LLC and QuiBids Holdings LLC (collectively referred to as "QuiBids") respectfully move to dismiss Plaintiff's Complaint (Doc. # 1) for lack of personal jurisdiction and for failure to state a claim upon which relief may be granted.  As is more fully articulated below, the Complaint should be dismissed, at least as to QuiBids, because: (1) this Court lacks personal jurisdiction with respect to QuiBids; and (2) Plaintiff fails to allege the facts necessary to support its claim for tortious interference with contract.

## D.C.Colo.L.Civ.R. 7.1(A) CERTIFICATION

QuiBids certifies that, pursuant to D.C. Colo. L. Civ. R. 7.1(A), counsel for QuiBids discussed the grounds for 12(b)(6) defense and the relief requested with counsel for the Plaintiff on June 28, 2013.  Counsel for Plaintiff indicated that they would consult with their client and, if we did not hear back by the filing deadline, they would be opposing the motion.

## INTRODUCTION

QuiBids is an Oklahoma City, Oklahoma based company which operates an Internet auction website, www.QuiBids.com (the "Website").  As an internet-based company, QuiBids contracts with various third-party marketing companies to advertise its Website.  Plaintiff Belcaro Group, Inc. d/b/a ShopAtHome.com ("SAH" or "Plaintiff") is an internet affiliate marketing company that generates revenue by driving new traffic to merchants' websites. Defendant YTZ International, Inc. ("YTZ") and non-party Turn Two Media, LLC ("Turn Two") are affiliate marketing networks.  QuiBids pays these two companies to drive new traffic to the Website on a cost per action ("CPA") model, meaning the customer must both (1) arrive at the Website through an advertising link hosted by the affiliate marketing network or its affiliate and (2) take a pre-defined action upon arriving at the Website.  When both of these events occur, QuiBids incurs a charge by the affiliate marketing network.  QuiBids later learned that SAH was serving as one of YTZ and Turn Two's affiliates to drive new traffic to QuiBids' Website on behalf of YTZ and Turn Two.

In late 2012, QuiBids discovered that SAH was fraudulently manipulating web traffic through various means and was causing QuiBids to be charged for conversions which SAH did not actually procure.  QuiBids contacted ShopAtHome regarding these practices in an attempt to

amicably resolve the dispute.  SAH induced QuiBids to refrain from filing its lawsuit by firmly representing to QuiBids that SAH would negotiate a settlement only if QuiBids refrained from filing a lawsuit.  During settlement negotiations and without notice to QuiBids, SAH filed this case against QuiBids.  However, this Court lacks personal jurisdiction over QuiBids.

I.    **The Court lacks personal jurisdiction over the QuiBids Defendants.**

A.  **Statement of facts in support of QuiBids' personal jurisdiction defense.**

1.      QuiBids is an Oklahoma LLC with its principal place of business in Oklahoma City, Oklahoma.  (Ex. 1, Geurts Aff., ¶ 1.)

2.      QuiBids Holdings is a Delaware LLC with its principal place of business in Oklahoma City, Oklahoma.  QuiBids holds a 94% interest in QuiBids Holdings.  (*Id.*, ¶ 2.)

3.      All of QuiBids' employees, officers, and directors work in Oklahoma.  (*Id.*, ¶ 5.)

4.      QuiBids is not based in Colorado, does not have an office in Colorado, does not own real property in Colorado, does not have a telephone number or address in Colorado, and is not registered as a business or foreign business with the Colorado Secretary of State.  (*Id.*, ¶¶ 1-2, 6-7.)

5.      No employee of QuiBids has ever been permanently stationed in Colorado, no company meetings have ever occurred in Colorado, and no business records or bank accounts are maintained in Colorado.  (*Id.*, ¶ 8.)

6.      QuiBids' national advertisements on television and the internet may be displayed in Colorado from time to time, though QuiBids does not specifically market itself to Colorado. QuiBids' advertising campaign is national in character and does not target any state specifically. QuiBids has made no effort to develop business specifically in Colorado.  (*Id.*, ¶ 10.)

7.      QuiBids does contract with a fulfillment company to handle a small amount of QuiBids' inventory.  By happenstance, this vendor, which is presently owned by a Texas-based company, maintains warehouse space in Colorado.  QuiBids did not seek out space in Colorado, and QuiBids enjoys no specific business, strategic or logistical advantage to the vendor maintaining warehouse space in Colorado.  Year to date, product maintained by this fulfillment company accounts for only approximately 3.38% of QuiBids' sales revenues.  (*Id.*, ¶¶ 14, 15.)

8.      QuiBids serves customers who live in Colorado.  Yet, QuiBids' connections to Colorado are not significantly different, in that regard, from its connections to any state other than Oklahoma, its home state.  QuiBids' Colorado customers account for only 1.77% of QuiBids' total customer base, and 1.72% of QuiBids' national sales revenues.  (*Id.*, ¶¶ 11-13.)

9.      QuiBids has no contractual privity with SAH.  QuiBids is not a party to the contracts attached to SAH's Complaint, including the Master Terms and Conditions Agreement with YTZ ("YTZ Master Agreement"), with RRM ("RRM Master Agreement"), or with Turn Two ("Turn Two Master Agreement") (collectively, "Master Agreements").  Prior to initiating settlement discussions with SAH, QuiBids had never seen any of these contracts, and QuiBids was not specifically aware of the existence of such contracts.  (*Id.*, ¶¶ 16-21.)

10.     Any contract between SAH, on the one hand, and YTZ, RRM and Turn Two, on the other hand, does not involve QuiBids.  QuiBids has never granted YTZ, RRM or Turn Two any authority to act as an agent of QuiBids.  YTZ and Turn Two have never served as anything other than independent contractors.  (*Id.*, ¶¶ 16-20.)

11.     QuiBids is not presently aware of having any relationship with RRM.  (*Id.*, ¶ 18.)

12.     QuiBids has no present awareness of having any contact with SAH prior to counsel for QuiBids contacting SAH in March of 2013 regarding QuiBids' suspicions of SAH's fraudulent practices.  QuiBids has never communicated with SAH concerning whether anyone had authority to act as an agent of QuiBids for advertising or any other function. (*Id.*, ¶ 21.)

**B.  Argument in support of QuiBids' personal jurisdiction defense.**

In the face of a challenge to personal jurisdiction, the plaintiff has the burden of proving jurisdiction exists.  *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).  Personal jurisdiction comes in two forms – "general or all-purpose jurisdiction, and specific or case-linked jurisdiction."  *Goodyear Dunlop Tires Operations, S.A., v. Brown*, 131 S.Ct. 2846, 2851 (2011).  Personal jurisdiction can also be waived through, among other things, forum selection clauses.  SAH cannot meet its burden because QuiBids did not consent to suit in Colorado and is not subject to general or specific personal jurisdiction.

> ### 1.     *QuiBids did not consent to being sued in Colorado, as YTZ and RRM did not act as agents of QuiBids when executing their Master Agreements with SAH.*

SAH's primary theory of personal jurisdiction is that forum selection clauses in its YTZ and RRM Master Agreements somehow bind QuiBids to litigate this suit in Colorado. (Complaint, at ¶ 8.)  In essence, SAH maintains that YTZ and RRM waived personal jurisdiction on behalf of QuiBids.  SAH's theory that YTZ and RRM were agents of QuiBids with authority to subject QuiBids to suit in Colorado is based on identical provisions in SAH's own form contracts:

> **Media Placement**. BGI shall promote Advertiser's offers ("Offers"), including both Advertiser's direct offers as well as offers for which Advertiser is acting on behalf of third party advertising agencies, marketers and others (collectively, "Marketers") in BGI media ("Media") pursuant to the terms set forth [herein].

(Doc. # 1-1, Complaint Ex. 1, YTZ Master Agreement at ¶ 1.)  These provisions concerning placement of "Offers" can hardly be construed as YTZ or RRM having authority to bind QuiBids (and indeed every merchant for whom YTZ and RRM are advertising) to a forum selection clause.  Moreover, YTZ and RRM had no actual or apparent authority to act as QuiBids' agents, and YTZ or RRM's act of signing SAH's form agreement could not otherwise create an agency.

The party asserting the existence of an agency relationship carries the burden of proving the relationship exists.  *See Daniel v. Ben E. Keith Co.*, 97 F.3d 1329, 1335-36 (10th Cir. 1996).[1] Two types of agency authority exist – actual (either express or implied) and apparent.  *See St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 703-704 (10th Cir. 2002). No "formal arrangement" of actual agency authority has ever existed between QuiBids and YTZ or between QuiBids and RRM.  (Ex. 1, Geurts Aff., ¶¶ 16-17.)  In fact, QuiBids has no present awareness of ever having done business with RRM.  (*Id*., ¶ 18.) Therefore, the success of SAH's consent theory depends on the existence of apparent authority between QuiBids and YTZ.

"'Apparent authority' of an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing."  *See St. Anthony Hosp.*, 309 F.3d at 704.  In order for a third party to establish apparent authority and hold the principal

---

[1] Whether an agency exists between QuiBids and YTZ or RRM has no relationship to Colorado. If an agency relationship was formed, it was formed in Oklahoma.  QuiBids maintains that Oklahoma law governs whether an agency relationship exists between QuiBids and YTZ or RRM. Nevertheless, the result would be the same under Colorado law.  *See, e.g.*, *Hancock v. Minneapolis-Moline, Inc.*, 482 P.2d 426, 428 (Colo. Ct. App. 1971) ("The burden of proof is on the plaintiff to prove this relationship where plaintiff brings suit upon a contract alleged to have been made by an agent."); *Villalpando v. Denver Health and Hosp. Authority,* 181 P.3d 357, 363 (Colo. Ct. App. 2007) (noting "apparent authority is established by proof of written or spoken words or other conduct of the principal which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him.") (quotations omitted).

responsible for the acts of an agent, the party asserting the existence of the agency relationship must show a) conduct of the principal which demonstrates an agency relationship exists, b) reliance by a third person on the principal's conduct and c) the third party changes its position due to that reliance.  *See id.*; *Diamond Sevens, L.L.C. v. Intelligent Home Automation, Inc.*, 245 P.3d 1260, 1264 (Okla. Civ. App. 2010).

SAH alleges no conduct by QuiBids demonstrating that it ever granted YTZ authority to act as its agent.  This omission is fatal to SAH's theory because "[a]n agency relationship created under the theory of apparent authority is not established on the representations or statements of the putative agent alone."  *See Diamond Sevens,* 245 P.3d at 1264.  "**[C]onduct of the principal is paramount** when establishing that such a relationship exists."  *See id.* (citing *Stephens v. Yamaha Motor Co., Ltd.*, 627 P.2d 439, 441 (Okla. 1981)) (emphasis added); *Bayless v. Christie, Manson & Woods Int'l, Inc.*, 2 F.3d 347, 354 (10th Cir. 1993) ("In other words, apparent authority cannot be established solely by the conduct of the agent.").

Moreover, SAH had a duty to verify the existence and scope of the purported agency relationship at the time it entered into its Master Agreement with YTZ.  *See BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1105 (10th Cir. 1999) ("Persons dealing with a supposed agent have a duty to ascertain for themselves the fact and scope of the agency."); *Miller & Miller Auctioneers, Inc. v. Mersch*, 442 F. Supp. 570, 576 (W.D. Okla. 1977) ("A third person, by undertaking to deal with a known or purported agent, is put upon inquiry as to the nature and scope of his powers, and must use due care to discover them or else suffer the consequences if they are exceeded."); *Bayless*, 2 F.3d at 354 ("An agency does not exist merely because a third person assumed that it existed, nor because the alleged agent

assumed to act as such, nor because the conditions and circumstances were such as to make such an agency seem rational and probable.") (internal citations omitted)); *Wheeler v. Puritan Ins. Co.*, 720 P.2d 729, 731 (Okla. 1986) ("Additionally, the third person must know the facts and, acting in good faith, have reason to believe, and also actually believe, the agent possessed that authority."). SAH fails to allege any facts demonstrating that it independently confirmed the existence of an agency relationship between QuiBids and YTZ (or RRM for that matter). Rather, SAH appeared to rely upon boilerplate language in **its own form Master Agreement** that YTZ was "acting on behalf of [unknown] third party advertising agencies, marketers, and others."[2] (Complaint at ¶¶ 14-17.) In fact, until QuiBids discovered that it was being defrauded by SAH, the parties had never even interacted, let alone communicated regarding the extent to which others were authorized to negotiate on QuiBids' behalf. (Ex. 1, Geurts Aff., ¶ 21.)

SAH alleges no conduct by QuiBids, the alleged principal of this agency relationship, upon which SAH relied in making its determination that YTZ was authorized to waive personal jurisdiction on behalf of QuiBids. Rather, SAH asserts the presence of an agency relationship based on a vague clause, concerning "**Media Placement**," in SAH's standard form contract. Plaintiff has not and cannot meet its burden of proving that YTZ or RRM were acting as agents of the QuiBids Defendants, and Plaintiff's consent theory must fail.

> ## 2. *The Court lacks <u>general</u> jurisdiction over QuiBids.*

As a fallback, SAH also appears to rely on a theory of general personal jurisdiction. To demonstrate general jurisdiction, SAH must establish that QuiBids' general business contacts

---

[2] If SAH's position is correct, that means YTZ and RRM are acting as agents for every advertiser that has engaged their services as an affiliate marketing network and that all such advertisers are now amenable to suit in Colorado. That is a radical theory that SAH cannot truly believe.

with Colorado are so "continuous and systematic" that jurisdiction is appropriate under the Due Process Clause even though SAH's causes of action have no relation to those contacts. *See, e.g.*, *Helicopeteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).  Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, which is a "high burden" for the plaintiff to meet.  *See Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 94 (10th Cir. 2012) (citing *Benton v. Cameco Corp.*, 375 F.3d 1070, 1080 (10th Cir. 2004)).  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."  *See Goodyear Dunlop Tires*, 131 S. Ct. at 2853-54.  QuiBids cannot be fairly regarded as "home" in Colorado, especially when comparing their Colorado contacts with those in Oklahoma.

SAH appears to allege that the Court has general personal jurisdiction over QuiBids "by virtue of their transacting, operating, and soliciting business in this District."  (Complaint at ¶ 9.)  This allegation alone, based on SAH's "information and belief," is insufficient to demonstrate general personal jurisdiction.  QuiBids is not based in Colorado, does not have an office in Colorado, does not own any real property in Colorado, does not have a telephone number or address in Colorado, and is not registered with the Colorado Secretary of State.  (Ex. 1, Geurts Aff., ¶¶ 1-2, 6-8.) No QuiBids employee has ever been permanently stationed in Colorado, no company meetings have ever occurred in Colorado, and no business records or bank accounts are maintained in Colorado.  (*Id.*, ¶ 8.)  The most that can be said regarding a presence in Colorado is that national advertisements for QuiBids may be seen on television and the internet in Colorado; a small percentage of QuiBids' customers reside in Colorado; and QuiBids uses a

vendor for a small portion of its fulfillment, which happens to maintain warehouse space in Colorado. (*Id.*, ¶¶ 10-15.)

The United States District Court for the Northern District of Illinois recently analyzed whether QuiBids was subject to general jurisdiction in Illinois. *See Bryant v. QuiBids LLC*, 11-CV-1013, 2012 WL 394154 (N.D. Ill. Feb. 3, 2012). That court held that "the QuiBids website is advertised nationally, not with any specificity to [the State], and the website is accessed across the United States, not specifically or only in [the State]." *Id.* at *3. Further, the court recognized that, "'[i]f the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution.'" *Id.* (quoting *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) and citing *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010)). QuiBids is fundamentally the same company today as when *Bryant* was decided, and has similar if not identical contacts with Colorado as with Illinois. General personal jurisdiction is similarly lacking in this matter.

The Tenth Circuit has arguably not had as much experience as the Seventh Circuit in applying the concept of general jurisdiction to internet-based companies, but the Tenth Circuit has acknowledged that "[a] website will subject a defendant to general personal jurisdiction only when the defendant has actually and deliberately used its website to conduct commercial transactions on a sustained basis with a substantial number of residents of the forum" and with commercial contacts "that approximate a physical presence in the state." *See Shrader v. Biddinger*, 633 F.3d 1235, 1243 (10th Cir. 2011) (internal citations omitted). Simply "engaging in commerce with residents of the forum state is not in and of itself the kind of activity that

approximates physical presence within the state's borders." *Id.* Acknowledging that the omnipresence of the internet presents problems related to a general personal jurisdiction inquiry, the *Shrader* Court determined that "it is necessary to adapt the analysis of personal jurisdiction to this unique circumstance by placing emphasis on the internet user or site intentionally directing his/her/its activity or operation at the forum state rather than just having the activity or operation accessible there." *See id.* at 1240-41 (internal citations and emphasis omitted).

QuiBids maintains a nationally-available website and does not intentionally direct its internet activities at Colorado or otherwise seek to cultivate unique business activity in Colorado. (Ex. 1, Geurts Aff., ¶ 10.)  The QuiBids Website is merely accessible in Colorado, the same as it is in every other state.  QuiBids no more intentionally directs business into Colorado over the internet than to any other state.  (*Id.,* ¶ 10.)  Only 1.77% of QuiBids' national customer base and 1.72% of QuiBids' total sales revenues come from Colorado.  (*Id.*, ¶¶ 11-12.)  If QuiBids could be unsuspectingly haled into Colorado to answer for claims unrelated to its relatively nominal presence there, this would "render[] the territorial limits of personal jurisdiction meaningless" - the exact result courts have been trying to avoid.  *Shrader*, 633 F.3d at 1240.

Seeking to avoid the destruction of the general personal jurisdiction doctrine, courts around the country have ruled similarly to the Tenth Circuit with regard to whether the ability to access an interactive website facilitating commercial transactions establishes general jurisdiction in an otherwise lacking forum.  *See, e.g., Estate of Bank v. Swiss Valley Farms Co.,* 286 F. Supp. 2d 514, 517 (D. Md. 2003) (demonstrating the Fourth Circuit's disfavor of broad general jurisdiction in the context of websites as "risking the evisceration of constitutional limits" and citing to numerous Fourth Circuit District Court decisions where the presence of employees and

millions of dollars in revenue did not establish general personal jurisdiction); *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 829 (N.D. Ill. 2000) (finding no general jurisdiction where a website allows worldwide visitors to both view and purchase the same household goods and furniture sold in the retail store); *Arlington Indus., Inc. v. Elec. Custom Distributors, Inc.*, 817 F. Supp. 2d 473, 479-80 (M.D. Pa. 2011) (citing to Eight Circuit and Federal Circuit precedent supporting the idea that while a relatively small volume of business does not preclude a finding of general jurisdiction, it is generally not enough to independently satisfy general personal jurisdiction requirements). *But see Gator.Com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072, 1077–78 (9th Cir. 2003) (holding that L.L. Bean's online business in the state (sales of over $200 million in one year, accounting for 16% of its total sales) and its "consistent, ongoing and significant sales effort that included California for a number of years," were sufficient for the exercise of general personal jurisdiction, but acknowledging that even given the defendant's high volume of online business, the case presented a "close question").

If QuiBids was found to be subject to general personal jurisdiction in Colorado, it logically follows that QuiBids, and every other similarly situated company, would then be subject to general jurisdiction in every state, opening up QuiBids (and countless other internet-based companies, **including SAH**) to suit for any claim, in any jurisdiction, at any time.  Words of caution from the Seventh Circuit are apt for this case:  "'Courts should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state, even if that site is 'interactive.'"  *See be2 LLC*, 642 F.3d at 558 (quoting *Ill. v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010)).  QuiBids lacks the magnitude of

continuous and systemic contacts with Colorado that would be necessary for QuiBids to be found at home in Colorado.  Plaintiff is unable to meet its "high burden."

> ### 3.    The Court also lacks _specific_ personal jurisdiction over QuiBids.

QuiBids will also address specific personal jurisdiction, though it is unclear that SAH seeks to rely on this theory.  A court may exercise specific jurisdiction over a defendant if the defendant's minimum contacts in or directed at the forum give rise to the claims which are the subject of the litigation.  _See Pro Axess, Inc. v. Orlux Distribution, Inc._, 428 F.3d 1270, 1276 (10th Cir. 2005); _Shell v. Am. Family Rights Ass'n_, 899 F. Supp. 2d 1035, 1049 (D. Colo. 2012).  If a defendant's contacts do give rise to such a claim, the Court must then consider whether its assertion of jurisdiction would comport with fair play and substantial justice.  _See Burger King Corp. v. Rudzewicz_, 471 U.S. 462, 476 (1985).

SAH's Complaint lacks meaningful factual allegations of actions undertaken specifically by QuiBids in Colorado which give rise to this action for a declaratory judgment and tortious interference.  The only alleged contact that is otherwise connected to this litigation is that "QuiBids has threatened to file suit" against SAH.  (Complaint at ¶¶ 8-9, 15-17.)  This vague assertion of "threatened litigation" by SAH is unsupported by facts which would establish the minimum contacts necessary for personal jurisdiction over QuiBids in Colorado.

Assuming for the sake of argument that SAH seeks to establish specific personal jurisdiction based on its allegation of "threatened litigation," SAH appears to claim that a few isolated communications between QuiBids' counsel and SAH regarding this dispute are sufficient to establish minimum contacts such that QuiBids could fairly be said to have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus

invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). This theory is without merit and would create a chilling effect on parties reaching across state lines to settle potential business disputes without first resorting to litigation.

The Tenth Circuit has "established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts." *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995) (citing *Continental American Corp. v. Camera Controls Corp.*, 692 F.2d 1309, 1314 (10th Cir. 1982) ("It is fundamental that the mere quantum of contacts between the forum and the defendant is not determinative"). Analyzing demand letters specifically, other courts have held that "the sending of letters threatening . . . litigation is not sufficient to confer personal jurisdiction." *See Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1202 (Fed. Cir. 2003). In the *Silent Drive* case, the plaintiff sought a declaratory judgment against a defendant based on "letters threatening suit." *See id.* at 1194-95. The Court held that even though the letters were "purposefully directed" at the forum and the declaratory judgment action "arises out of" the letters, the letters themselves "do not suffice to create personal jurisdiction" because to exercise jurisdiction in such a situation would not "comport with fair play and substantial justice." *See id.* at 1202 (citing *Red Wing Shoe Co. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1358 (Fed. Cir.1998)). This conclusion is, of course, consistent with the notion that the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . ." *Burger King*, 471 U.S. at 475 (citations omitted). The scope of the minimum contacts must establish "a reasonable expectation in the out-of-state defendant that he might be brought into court in the

state where he sought to do business . . ." *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1057-58 (10th Cir. 2008).

Thus, a few isolated settlement communications are insufficient to support specific personal jurisdiction. Yet, even assuming the Court found the contacts sufficient, the exercise of personal jurisdiction must still comport with "traditional notions of fair play and substantial justice." *See ClearOne Communications, Inc. v. Bowers*, 643 F.3d 735, 764 (10th Cir. 2011). This inquiry requires a determination of whether personal jurisdiction over a defendant with minimum contacts is reasonable in light of the circumstances surrounding the case. *See id.* In assessing such reasonableness, a court must consider: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See id.* These factors can be summed up as "whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is reasonable in light of the circumstances surrounding the case." *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1078 (10th Cir. 2004) (internal citations omitted). Since there are few if any contacts between QuiBids and Colorado, QuiBids need not make a particularly strong showing in order to defeat jurisdiction under this reasonableness inquiry. *See id.* at 1080.

"The burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1096 (10th Cir. 1998) (internal citations omitted). In this case, the burden on QuiBids is significant. QuiBids is an Oklahoma company with principal

offices in Oklahoma City.  It has no physical presence in Colorado.  (Ex. 1, Geurts Aff., ¶¶ 1-2, 6-8.)  This declaratory judgment action is a defensive act by SAH.  QuiBids is the victim of the fraud; QuiBids' injury occurred in Oklahoma where it was billed for fraudulent charges; and QuiBids' claims will be governed by Oklahoma law.  Furthermore, SAH has not established that it would be precluded from convenient and effective relief if it sued QuiBids in Oklahoma, where QuiBids is undeniably based and at home.  As for the efficiency of any resolution, SAH has offered no evidence as to how Colorado is a more efficient venue than QuiBids' home jurisdiction of Oklahoma.  At best for SAH, either venue would be equally efficient as to the presence of witnesses or whether piecemeal litigation will be prevented.  *See id.*

The final factor – whether jurisdiction in Colorado would further fundamental social policies – weighs particularly heavily in favor of QuiBids.  Encouraging the settlement of legal and business disputes is important, desirable, and favored by the law and public policy of every jurisdiction in this nation.  *See Okla. Radio Assocs. v. F.D.I.C.*, 3 F.3d 1436, 1444 (10th Cir. 1993); *Gates Corp. v. Bando Chem. Indus.*, Ltd., 4 F. App'x 676, 682 (10th Cir. 2001) (Colorado public and judicial policies favor voluntary agreements to settle legal disputes) (citing *Colorado Ins. Guar. Ass'n v. Harris*, 827 P.2d 1139, 1142 (Colo. 1992)); *Whitehorse v. Johnson*, 156 P.3d 41, 46 (Okla. 2007) ("The law and public policy favor settlements and compromises, entered into fairly and in good faith between competent persons, as a discouragement to litigation.").  Here, SAH seeks to bootstrap personal jurisdiction over QuiBids in Colorado to claims based solely on a few communications that were intended to facilitate the settlement of this dispute without having to resort to the time and financial burdens inherent with litigation.  Allowing SAH to establish personal jurisdiction over QuiBids in Colorado would set the precedent of allowing

parties to abandon or ignore settlement negotiations before they even start, all for the purpose of trying to gain an advantage in litigation.  This does not in any way comport with the notions of "fair play" or "substantial justice."

## II.   Plaintiff fails to state a claim for tortious interference with its alleged contract with Turn Two.

QuiBids additionally moves to dismiss SAH's fourth count for failure to state a claim for which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).  SAH's theories that Turn Two was acting as an agent of QuiBids and that QuiBids withheld payment from Turn Two because of QuiBids' belief that it was getting wrongfully charged for fraudulent activity are incompatible with the SAH's tortious interference claim.

### A.  Plaintiff's alleged facts associated with the tortious interference claim.

SAH's fourth count generally alleges that "QuiBids intentionally, tortiously, and unjustly induced Turn Two Media to breach the turn Two Media Master Agreement."  (Complaint at ¶ 54).  SAH claims that Turn Two was "currently holding [SAH's] payment on [QuiBids] offer" and "QuiBids was refusing to pay Turn Two Media for SAH's services because of what QuiBids claimed to be fraudulent activity by SAH."  (*Id.*, ¶ 22.)  SAH also claimed that Turn Two was acting as QuiBids' agent.  (*Id.*, ¶ 2.)

### B.  Burden of proof.

SAH must allege facts which, taken as true, "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  SAH must "nudge [its] claims across the line from conceivable to plausible" in order to survive a motion to dismiss.  *Id.*  Mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" will not suffice.  *Twombly*, 550 U.S. at 555.  Rather, SAH must offer sufficient factual allegations to

"raise a right to relief above the speculative level." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). Thus, the Court must "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest" QuiBids is liable for tortious interference with contract. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190-91 (10th Cir. 2012).

Plaintiff bears the ultimate burden of proving tortious interference by a preponderance. *Astarte, Inc. v. Pac. Indus. Sys., Inc.*, 865 F. Supp. 693, 703 (D. Colo. 1994).

**C. Elements of tortious interference with contract.**

Plaintiff must allege that 1) QuiBids was aware of a contract between SAH and a third party; 2) QuiBids intended that the third party breach the contract; 3) QuiBids induced the third-party to breach or made it impossible for the party to perform the contract; 4) QuiBids actions were improper; and 5) the third party was not acting as an agent of QuiBids. *See Krystkowiak v. W.O. Brisben Companies, Inc.*, 90 P.3d 859, 871 (Colo. 2004); *MDM Group Assoc., Inc. v. CX Reinsurance Co. Ltd., U.K.*, 165 P.3d 882, 886 (Colo. App. 2007).

**D. Elements unsupported by allegations in the Complaint.**

Element 1) SAH does not allege facts establishing that QuiBids was aware of the contract between SAH and Turn Two, but it does allege that Turn Two was acting as QuiBids' agent (Complaint at ¶ 1).

Element 2) SAH does not allege facts establishing that QuiBids intended Turn Two to allegedly breach its contract with SAH.

Element 3) SAH does not allege facts establishing that QuiBids induced Turn Two to breach its contract with SAH; rather, it asserts that Turn Two did not pay SAH because QuiBids did not pay Turn Two.

Element 5) rather than alleging that Turn Two is a third party as to QuiBids, SAH alleges that Turn Two was acting as QuiBids' agent.

### E.  Argument in support of QuiBids' motion to dismiss for Plaintiff's failure to state a claim regarding tortious interference with contract.

SAH's theory of tortious interference is based on allegations that QuiBids stopped paying Turn Two because QuiBids believed SAH was engaging in fraudulent activity.  (Complaint at ¶ 22.)  Among QuiBids' claims against SAH (as characterized and reported by SAH) is the fact that the SAH toolbar "was redirecting Internet traffic intended for QuiBids to QuiBids' competitors."  (*Id.*, ¶ 23.)  Though SAH offers the conclusory assertion that QuiBids' claims "lack merit" (*id.*), SAH does not deny that computers on which the SAH toolbar was installed were redirecting links intended for QuiBids' Website to the website of a QuiBids competitor. SAH asserts only that this "was not done at the direction of SAH."  (*id.*, ¶ 30.)

At the outset, Plaintiff's claim for tortious interference with contract against QuiBids should be dismissed because SAH alleges tortious interference within an agency relationship. (*Id.*, ¶ 14.)  Though QuiBids expressly and firmly denies any agency relationship between it and Turn Two, taking SAH's allegations as true solely for the purpose of this motion to dismiss for failure to state a claim, the law recognizes that a principal cannot interfere with its agent's contract, as it would be interfering with <u>its own</u> contract.  *See MDM Group Assoc., Inc. v. CX Reinsurance Co. Ltd., U.K.*, 165 P.3d 882, 886 (Colo. App. 2007) (when evaluating a claim for tortious interference with prospective economic advantage, the court stated "a defendant cannot

be liable for interference with its own contract" and recognized a number of cases holding that a principal cannot induce a breach of contract between its agent and customers); *Enderwood v. Sinclair Broadcast Group, Inc.*, 233 Fed. Appx. 793 (10th Cir. 2007) (finding no viable interference claim when agents acted on behalf of principal, as it is essentially alleging a principal interfered with its own contract). Because SAH alleges Turn Two was acting as QuiBids' agent, SAH essentially alleges that QuiBids interfered with its own contract.

Even setting aside SAH's allegation that Turn Two was acting as an agent of QuiBids, SAH's factual allegations still fail to state a claim for tortious interference. SAH fails to allege that QuiBids **intended** Turn Two to breach its alleged contract with SAH. SAH does not deny that, on computers with the SAH toolbar, links to QuiBids' Website were being redirected to one of QuiBids' competitors. SAH only denies that it was at fault for this behavior. (Complaint at ¶ 30.) SAH does not allege that QuiBids withheld payment from Turn Two because it "intend[ed]" that Turn Two would breach a contract with SAH. In fact, by SAH's own allegations, QuiBids withheld payment from Turn Two "because of what QuiBids claimed to be fraudulent activity by SAH." (*Id.*, ¶ 22; *see also id.* at ¶ 23 ("SAH learned that QuiBids' refusal to pay Turn Two Media, and thus Turn Two Media's refusal to pay SAH, was allegedly based on the functionality of SAH's Toolbar.")).

"The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the **unintended effect of deterring the third person from dealing with the other**." *Kennedy v. Williams R. Hudon, Inc.*, 659 F. Supp. 900, 904 (D. Colo. 1987) (quoting Restatement (Second) of Torts § 766, Comment h) (emphasis added). Further,

> If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is **endeavoring to advance some interest of his own**, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a **minor and incidental consequence** and **so far removed from the defendant's objective** that as against the plaintiff the interference may be found to be not improper.

*Id.* (quoting Restatement (Second) of Torts § 766, Comment j) (emphasis added).  Aside from Plaintiff's conclusory allegation that QuiBids "intentionally, tortiously, and unjustly induced Turn Two Media to breach the Turn Two Media Master Agreement" (Complaint at ¶ 54), Plaintiff's only identification of QuiBids' motives or intent is evidence of advancing a self-interest—*i.e.* protecting itself from what it believed to be fraudulent activity.  Plaintiff's mere formulaic recitation of the elements is insufficient to pass muster under the *Twombly* standard. *Khalik*, 671 F.3d at 1190-91.

Further, Plaintiff has alleged no facts that would show that Turn Two's decision to not pay SAH was induced by (rather than a mere incidental consequence of) QuiBids' actions.  Even if all of Plaintiff's allegations were true, Turn Two had every opportunity to pay SAH and sue QuiBids for failure to pay.  That Turn Two made the decision to withhold payment to SAH was never QuiBids' objective—and in fact, Plaintiff has not <u>pled</u> that it was QuiBids' objective. Plaintiff actively recognizes that QuiBids' objective was related to QuiBids' belief that it was being charged by Turn Two for fraudulent activity.  SAH instead claims that QuiBids "unjustly induced Turn Two Media to breach the Turn Two Media Master Agreement *by refusing to pay Turn Two Media in accordance with the Turn Two Media Master Agreement*."  (Complaint at ¶ 54 (emphasis added).)  Yet QuiBids is not a party to the alleged "Turn Two Media Master Agreement," and it had no obligation to pay Turn Two "*in accordance with the Turn Two Media Master Agreement*."

In the end, SAH's claims boil down to an assertion that QuiBids withheld payment to Turn Two because QuiBids believed it was being wrongfully and fraudulently charged.  SAH does assert that QuiBids' allegations "lack merit" with respect to SAH (Complaint at ¶ 23) and that QuiBids' refusal to pay Turn Two for charges it believed to be fraudulent was "unjust[]" (*id*., ¶ 54), but these are the type of conclusory assertions that are disregarded under *Twombly*.

CONCLUSION

SAH's Complaint fails to demonstrate that this Court has either general or specific personal jurisdiction as to the QuiBids Defendants.  Furthermore, SAH fails to allege facts that state a claim for tortious interference with contract.   The QuiBids Defendants, therefore, request dismissal for lack of personal jurisdiction and failure to state a claim upon which relief may be granted.

Respectfully submitted,

s/ Gregory T. Metcalfe
Gregory T. Metcalfe, OK Bar # 19526
John M. "Jake" Krattiger, OK Bar # 30617
**GABLEGOTWALS**
One Leadership Square, Suite 1500
211 North Robinson
Oklahoma City, OK  73102-7101
(405) 235-5500 | (405) 235-2875 (fax)
GMetcalfe@gablelaw.com
JKrattiger@gablelaw.com

Steven Janiszewski
**Riggs Abney Neal Turpen Orbison & Lewis**
7979 E Tufts Avenue Parkway, Suite 1300
Denver, CO 80237
(303) 298-7392 | (303) 298-1319 (fax)
sjaniszewski@riggsabney.com

**Attorneys for Defendants**
**QuiBids LLC & QuiBids Holdings LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2013, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jennifer Ann Golinveaux
Email: jgolinveaux@winston.com

John (Jack) Markham Tanner
Email: jtanner@fwlaw.com

s/ Gregory T. Metcalfe
Gregory T. Metcalfe