THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-01424-MSK-BNB

BELCARO GROUP, INC. d/b/a SHOPATHOME.COM, a Colorado corporation,

    Plaintiff,

v.

QUIBIDS LLC, an Oklahoma limited liability company,
QUIBIDS HOLDINGS LLC, a Delaware limited liability company,
YTZ INTERNATIONAL INC. f/k/a PPX and a/k/a WSF MONETIZATION, a Canada corporation, and
RAPID RESPONSE MARKETING LLC f/k/a XY7.COM and a/k/a XY7ELITE.COM, a Nevada limited liability company.

    Defendants.

_____

**PLAINTIFF BELCARO GROUP, INC.'S RESPONSE TO DEFENDANT YTZ INTERNATIONAL, INC.'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(2), 12(b)(5) AND 12(b)(6)**
_____

Plaintiff Belcaro Group, Inc. d/b/a ShopAtHome.com ("SAH"), by and through its attorneys Michael Elkin, Jennifer Golinveaux, and Fairfield and Woods, P.C., responds to the Motion to Dismiss Pursuant to F.R.C.P. 12(b)(2), 12(b)(5), and 12(b)(6) (the "Motion") of YTZ International, Inc. ("YTZ") as follows.

## I.    INTRODUCTION

YTZ's motion fails to establish any grounds for dismissal. YTZ is obligated by contract to submit to the jurisdiction of this Court and to accept service of process via mail. SAH has met its burden of establishing that YTZ is bound by this contract by submitting evidence sufficient to establish that YTZ assumed the contractual obligations of its predecessor PPX. In particular, YTZ paid PPX invoices dating back to December 2011. Accordingly, YTZ's jurisdictional

challenges to the Complaint must fail. To the extent the Court finds SAH's jurisdictional arguments lacking, it should allow for the limited jurisdictional discovery that SAH requests in a separate motion filed concurrently herewith.

Additionally, SAH's Complaint alleges sufficient facts to state a plausible claim for express indemnity. It is YTZ's failure to disclose the redirect functionality of SAH's Toolbar software to its advertiser QuiBids LLC[1] that prompted QuiBids to threaten to bring claims against SAH. Accordingly, YTZ's own conduct contributed to the claims for which SAH now seeks indemnification from YTZ. Even if the claims against SAH resulted from SAH's own negligence (which they did not), the language in the indemnification provision evidences the parties' intent to indemnify SAH for its own negligence. Therefore, SAH has properly stated a claim against YTZ for express indemnity.

## II.   FACTUAL BACKGROUND

SAH is an online loyalty site for online shoppers. (*See* Compl. (Dkt. No. 1) ¶ 11.) SAH enters into agreements with networks and merchants to promote certain content and offers cash rebates for some online purchases to members who meet certain eligibility criteria. (*See id.*)

Since at least October 2010, SAH has promoted various QuiBids offers and advertisements through agreements entered into with networks acting on QuiBids' behalf, including (among others) YTZ. (*See id.* ¶ 14.) Beginning in March 2013, SAH learned that QuiBids was claiming that certain of SAH's products and services, and in particular the redirect

---

[1] SAH has reached a settlement with QuiBids LLC and QuiBids Holdings LLC as of August 30, 2013. The settlement does not prevent SAH from seeking indemnification from YTZ and Rapid Response Marketing LLC. *See Public Serv. Co. v. United Cable Television of Jeffco, Inc.*, 829 P.2d 1280, 1281 (Colo. 1992) (allowing claim for indemnity to proceed after indemnitee had settled with the third party and paid the claim).

-2-

feature of its Toolbar software, were fraudulent because SAH failed to adequately disclose those services in its contracts terms.  (*See id.* ¶ 19.)  However, SAH fully disclosed the redirect feature of the Toolbar to YTZ and the other networks, and it denies any wrongdoing.  (*See id.* ¶¶ 20, 25-28.)

SAH entered a Master Terms and Conditions Agreement (the "Master Agreement") with PPX/YTZ on November 16, 2010.  (*See* Compl. Ex. 1 (Dkt. No. 1-1); Compl. ¶ 17.)  Under the terms of the Master Agreement, PPX/YTZ agreed to indemnify SAH if a dispute arose with regard to PPX/YTZ's placement of advertisements with SAH.  (*See* Compl. ¶ 31.)  SAH alleges that it entered into the Master Agreement with YTZ, and it can thus be inferred from the facts alleged in the Complaint that YTZ assumed PPX's contractual obligations under the Master Agreement.  (*See id.* ¶¶ 5 (YTZ formerly known as PPX), 8 (alleging contract between SAH and YTZ), 17 (same).)  YTZ made advertising offers available to SAH on behalf of QuiBids until in or around March 2013.  (*See id.* ¶ 18.)

When SAH contacted PPX in May 2012 regarding an outstanding payment, it received a return email from someone purporting to represent YTZ that stated, "A wire for $107,960.00 was requested and should be in your account tomorrow for Dec-Mar invoices."  (*See* Affidavit of Cynthia W. Stickney ¶ 6, Ex. A.)  YTZ claims that it did not become "operational" before July 19, 2012.  (*See* Dennis Decl. (Dkt. No. 25-1) ¶ 5.)  YTZ further states it "had not conducted any business" before that time.  (*See id.*)  But SAH began receiving emails from YTZ starting in May 2012.  (*See* Stickney Aff. ¶ 6, Ex. A.)  And when SAH contacted PPX to request an outstanding payment, it received an email back from YTZ indicating that YTZ would wire money to SAH for PPX invoices dating back to December 2011.  (*See id.*)  Additionally, YTZ's own website states

-3-

that it has "worked with redirect traffic for over 5 years, and in affiliate marketing since 2001." *See* http://ytz.com/faq (last visited September 3, 2013).

Additionally, the Master Agreement between SAH and PPX is signed by Tobiah Adam on behalf of PPX. (*See* Compl. Ex. 1.) Mr. Adam was SAH's primary point of contact with both PPX and YTZ. (*See* Stickney Aff. ¶¶ 7-8.) Without any formal notification, Mr. Adam began corresponding with SAH from a YTZ email address as early as June 29, 2012. (*See id.* ¶ 7, Ex. B.) Indeed, for a certain period of time, Mr. Adam's emails came from a YTZ email address even though he continued to use a PPX signature block. (*See id.*) Mr. Adam also retained the same phone number when he transitioned from PPX to YTZ. (*See id.*) The offers and advertisements that YTZ made available to SAH were the same offers and advertisements that PPX had made available to SAH. (*See id.* ¶ 8.) In other words, SAH and Mr. Adam continued doing business seamlessly as PPX transitioned to YTZ without any notification to SAH other than the change to Mr. Adam's email address and eventually the signature block on his emails. (*See id.* ¶¶ 6-8.) As a result of the conduct of YTZ and its employees, SAH reasonably assumed that YTZ was the successor to PPX.

QuiBids threatened to file suit against SAH, claiming that SAH's Toolbar routs user traffic through SAH's website without proper disclosures. (*See* Compl. ¶ 23.) But SAH fully disclosed the functionality of the Toolbar to YTZ and other networks that placed advertisements with SAH on behalf of QuiBids. (*See id.* ¶ 20.) First, SAH disclosed the Toolbar functionality to YTZ in the Master Agreement. (*See id.* ¶¶ 25-27.) Second, an SAH Account Executive discussed the redirect functionality of its Toolbar with a YTZ representative. (*See id.* ¶ 28.) Additionally, YTZ touts on its website that it has been "work[ing] with redirect traffic" for "over

5 years," suggesting that it is familiar with and understands the redirect features of the Toolbar. (*See id.*)   Accordingly, SAH seeks indemnification from YTZ for any liability to QuiBids resulting from the claims asserted against SAH.  (*See id.* ¶¶ 40-49.)

## III. THE COURT SHOULD DELAY RULING ON YTZ'S MOTION TO DISMISS UNTIL SAH IS GIVEN THE OPPORTUNITY TO SUPPLEMENT ITS RESPONSE AFTER LIMITED JURISDICTIONAL DISCOVERY

SAH, through a separate, affirmative motion filed concurrently herewith, seeks jurisdictional discovery in connection with YTZ's motion to dismiss for lack of personal jurisdiction and insufficient service of process.  For the reasons stated in more detail therein, SAH seeks discovery regarding whether YTZ assumed the contractual obligations of PPX in its dealings with SAH.  The Master Agreement between SAH and PPX contains a forum selection clause whereby PPX expressly consented to the jurisdiction of this Court.  Additionally, as YTZ concedes (*see* Motion at 12), SAH's service of process on YTZ via mail is sufficient under the Master Agreement if YTZ is a party to that agreement (or if it has assumed the contractual obligations contained therein).  Accordingly, SAH has sought discovery regarding the relationship between YTZ and PPX for the purpose of obtaining further support for its response to YTZ's motion to dismiss.

## IV. SAH PROPERLY EFFECTED SERVICE OF PROCESS UPON YTZ

A plaintiff meets its burden of showing that it properly effected service of process by demonstrating that the procedure it employed satisfies the requirements of Rule 4 of the Federal Rules of Civil Procedure and that statutory and due process requirements have been met so as to permit the Court to exercise personal jurisdiction over the defendant.  *Savard v. JP Morgan*

*Chase Bank, N.A.*, No. 09-cv-2108-WDM-MJW, 2010 WL 2802543, at *2 (D. Colo. Jul. 14, 2010).[2]

### A. YTZ Agreed to Accept Service via Mail Under the Master Agreement.

"Absent fraud, duress, or other coercive factors," parties to a contract containing a forum selection clause are precluded "from later contesting personal jurisdiction unless they can clearly show that enforcement of the clause would be unreasonable." *Elec. Realty Assocs., L.P. v. Vaughan Real Estate, Inc.*, 897 F. Supp. 521, 522-23 (D. Kan. 1995). Here, under the Master Agreement, the parties "agree that service of process may be made by certified mail." (*See* Compl. Ex. 1 ¶ 12.) YTZ concedes SAH's service was sufficient under this provision if YTZ is a party to the contract or if YTZ has assumed the contractual obligations of PPX. (*See* Mot. at 12.)

SAH has made a prima facie showing that YTZ assumed the contractual obligations of PPX. YTZ made payments of over $100,000.00 to SAH on behalf of PPX. Specifically, when SAH contacted PPX in May 2012 regarding an outstanding payment, it received a return email from YTZ stating, "A wire for $107,960.00 was requested and should be in your account tomorrow for Dec-Mar invoices." (*See* Stickney Aff. ¶ 6, Ex. A.) Moreover, the declaration YTZ submitted in support of its motion to dismiss is plainly false. YTZ claims that it did not become "operational" before July 19, 2012. (*See* Dennis Decl. (Dkt. No. 25-1) ¶ 5.) YTZ further states it "had not conducted any business" before that time. (*See id.*) But SAH began receiving emails from YTZ starting in May 2012. (*See* Stickney Aff. ¶ 6, Ex. A.) And when

---

[2] "[W]hen a court finds that service is insufficient but curable, it generally should quash the service and give the plaintiff an opportunity to re-serve the defendant." *Pell v. Azar Nut Co., Inc.*, 711 F.2d 949, 950 n.2 (10th Cir. 1983).

SAH contacted PPX to request an outstanding payment, it received an email back from YTZ indicating that YTZ would wire money to SAH for PPX invoices dating back to December 2011. (*See id.*)  Additionally, YTZ's own website states that it has "worked with redirect traffic for over 5 years, and in affiliate marketing since 2001."  *See* http://ytz.com/faq (last visited September 3, 2013).

These facts are sufficient to establish that YTZ assumed the contractual obligations of PPX.  In particular, YTZ would not have wired over $100,000.00 to a company with which it had no valid contract.  SAH has met its burden of establishing that YTZ assumed PPX's contractual obligations, including the obligation to accept service of process by mail.  Therefore, YTZ's motion to dismiss for insufficient service of process should be denied.

### B.      Service by Mail Is Proper Under the Hague Convention.

Pursuant to the Federal Rules of Civil Procedure, proper service of a foreign corporation, partnership, or other unincorporated association can be made "by any internationally agreed means of service that is reasonably calculated to give notice."  Fed. R. Civ. P. 4(f)(1), 4(h)(2). This includes "those [means] authorized by the Hague Convention."  *Id.*  Article 10(a) of the Hague Convention states, "Provided the State of destination does not object, the present Convention shall not interfere with the freedom to send judicial documents, by postal channels, directly to persons abroad . . . ."  Hague Convention, art. 10(a).

Both the Second and the Ninth Circuits have held that "the word 'send' in Article 10(a) was intended to mean 'service,'" thus permitting the use of postal channels as a means of proper service of process under the Hague Convention.  *Ackermann v. Levine*, 788 F.2d 830, 838-39 (2d Cir. 1986) (holding that "[t]he service of process by registered mail did not violate the Hague

-7-

Convention"); *Brockmeyer v. May*, 383 F.3d 798 798, 802 (9th Cir. 2004) (agreeing with the Second Circuit's holding in *Ackermann* and finding that "send" in Article 10(a) includes "serve"); *see also Santiago v. Anderson*, 496 Fed. App'x 630, 635 (7th Cir. Aug. 6, 2012) (citing *Brockmeyer* with approval).

Multiple district courts have upheld service of process by mail upon Canadian corporations. *E.g. Dierig v. Lees Leisure Indus., Ltd.*, No. 11-125-DLB-JGW, 2012 WL 669968, at *19 (E.D. Ky. Feb. 28, 2012) ("Plaintiff's use of certified mail to serve Canadian Defendant . . . is proper as Canada has not stated its objection to the use of postal channels for service of process"); *Sibley v. Alcan, Inc.*, 400 F. Supp. 2d 1051, 1054-55 (N.D. Ohio 2005) (holding that "service of process by registered mail . . . to a Canadian defendant is permitted by Article 10(a) of the Hague Convention"); *TracFone Wireless, Inc. v. Does*, No. 11-cv-21871-MGC, 2011 WL 4711458, at *4 (S.D. Fla. Oct. 4, 2011) (finding that "Canada does not object to Article 10(a) and, accordingly, permits service by international express mail"); *Girafa.com, Inc. v. Smartdevil Inc.*, 728 F. Supp. 2d 537 (D. Del. 2010) ("Under Article 10 of the Hague Convention, Canada does not object to service by postal channels."); *McCormick v. Apache, Inc.*, No. 5:09CV49, 2009 WL 2985470, at *2 (N.D. W. Va. Sept. 15, 2009) (stating that "Canada, the destination country in this case, does not object to service under Article 10"); *Anderson v. Canarail, Inc.*, No. 05 Civ. 3828(HB), 2005 WL 2454072, at *4 (S.D.N.Y. Oct. 6, 2005) (finding that pursuant to the Hague Convention, "service of process by registered mail upon [the defendant] in Canada was a proper means of service"). Therefore, service by mail upon YTZ here complies with the Hague Convention and YTZ's motion to dismiss for insufficient service of process should be denied.

## V. THIS COURT HAS PERSONAL JURISDICTION OVER YTZ

"When a district court rules on a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, . . . the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *Id.* "In the preliminary stages of the litigation . . . the plaintiff's burden is light." *Elec. Realty Assocs., L.P. v. Vaughan Real Estate, Inc.*, 897 F. Supp. 521, 522 (D. Kan. 1995). "If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor." *Id.*

### A. YTZ Consented to the Jurisdiction of This Court by Assuming the Contractual Obligations of PPX.

In contract cases, the Court has personal jurisdiction over a defendant who "'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). "[P]arties who reach out beyond the state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (quotations omitted); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005). In addition, where a contract with the defendant contains a forum selection clause acquiescing to jurisdiction in the courts of the forum state, the court need not inquire any further into the defendant's minimum contacts with the forum state.

*Nuclear Cardiology Sys., Inc. v. Mangla*, No. 10-cv-00045-REB-CBS, 2010 WL 2135298, at *5 (D. Colo. May 25, 2010).

Here, the Master Agreement with PPX includes a forum selection clause:

> **Governance.** The laws of Colorado and applicable federal U.S. laws shall govern this Agreement. The parties agree that any claims, legal proceedings or litigation arising in connection with the Agreement will be brought solely in the state and federal courts located in Denver, Colorado and the parties consent to the jurisdiction of such courts.

(Compl. Ex. 1 ¶ 12.) As explained above, SAH has established that YTZ assumed the contractual obligations of PPX. Accordingly, YTZ is bound by the forum selection clause and has expressly consented to the jurisdiction of this Court. Its motion to dismiss for lack of personal jurisdiction should be denied.

### B. This Court Has Personal Jurisdiction Over YTZ by Virtue of YTZ's Ongoing Business Relationship With SAH.

Even if the Court were to find that YTZ did not assume the contractual obligations of PPX, the Court still has personal jurisdiction over YTZ as a result of YTZ's business dealings with SAH. The Court may exercise jurisdiction over parties to interstate contracts who "reach out beyond one state and create continuing relationships and obligations with citizens of another state." *Burker King Corp.*, 471 U.S. at 473, 105 S. Ct. 2174, 85 L. Ed. 2d 528. Even if were true, as YTZ asserts, that there is no written contract between YTZ and SAH, YTZ does not dispute that the parties had an ongoing and continuing business relationship whereby YTZ benefitted financially from the offers and advertisements it made available to SAH. As part of this business relationship, YTZ wired more than $100,000.00 to SAH in Colorado. (*See* Stickney Aff. ¶ 7, Ex. A.) SAH now seeks indemnification from YTZ and declaratory relief after one of YTZ's advertisers threatened to file suit against SAH. The claims at issue here thus arise

-10-

directly out of the business relationship between YTZ and SAH. Therefore, the allegations of the Complaint are sufficient to establish that the Court has specific personal jurisdiction over YTZ.

In sum, the Court has enough evidence of minimum contacts to deny the motion to dismiss outright. If it is not inclined to do so, however, it should reserve ruling until SAH has completed its jurisdictional discovery and supplemented this response.

## VI.     SAH HAS STATED A PLAUSIBLE CLAIM FOR RELIEF AGAINST YTZ

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). The plaintiff is required to plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As long as a plausible claim is pleaded, the complaint may proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556. On a motion to dismiss, the Court "assume[s] the truth of all well-pleaded facts in the plaintiffs' complaint." *Dias v. City & County of Denver*, 567 F.3d 1169, 1174 (10th Cir. 2009); *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (court must "accept as true all well-pleaded allegations of a plaintiff's complaint and view them in the light most favorable to the non-moving party").

### A. SAH Has Adequately Pleaded the Existence of an Indemnification Agreement Between YTZ and SAH.

The Complaint repeatedly alleges the existence of a contractual relationship between SAH and YTZ. For example, SAH alleges that Exhibit 1 to the Complaint is a "true, accurate, and complete copy of the Master Terms and Conditions Agreement between SAH and YTZ." (*See* Compl. ¶¶ 8, 17.) SAH further alleges that it advertised on behalf of QuiBids "through agreements entered into by third parties including YTZ [and others]." (*See id.* ¶ 14.) Citing the indemnification provision, SAH alleges that "YTZ . . . agreed in the Master Agreement[] to indemnify SAH if a dispute about the affiliate marketing procedures arose." (*See id.* ¶ 31.) Importantly, as YTZ admits, the Complaint alleges that YTZ was formerly known as PPX. (*See id.* ¶ 5.) Moreover, SAH has alleged specific facts establishing an ongoing business relationship with YTZ that lends credence to the allegation of a relationship between YTZ and PPX such that YTZ assumed PPX's contractual obligations. (*See, e.g.*, *id.* ¶¶ 18, 28, 32.) At this early stage, these allegations plausibly establish the existence of an indemnification agreement between SAH and YTZ sufficient to survive a motion to dismiss.

### B. The Indemnification Provision Applies to the Conduct at Issue.

#### 1. QuiBids' Claims Arise out of SAH's "Promotion and Distribution of the Offers."

Under the Master Agreement, YTZ agreed to indemnify SAH for any claims "relating to or arising out of . . . the promotion and distribution of the Offers." (*See* Compl. Ex. 1 ¶ 8.) The Offers are defined as YTZ's "direct offers as well as offers for which [YTZ] is acting on behalf of third party advertising agencies, marketers and others . . . pursuant to the terms set forth in these Master Terms and Conditions." (*See id.* ¶ 1.) As alleged in the Complaint, SAH

advertised on behalf of QuiBids through agreements with third parties, including YTZ. (*See* Compl. ¶ 14.) In connection with this advertising, SAH used a browser application, or "Toolbar," which redirected SAH's members through SAH's website to QuiBids when they typed in the QuiBids URL or clicked a link to QuiBids' website. (*See* Compl. ¶ 24.) QuiBids' claims against SAH arose out of the redirect feature of this Toolbar. (*See id.* ¶ 35.) Therefore, QuiBids' claims "related to" or "arose out of" SAH's advertising of QuiBids' Offers, which were made available to SAH through YTZ.

YTZ cannot point to anything in the Complaint or in the Master Agreement suggesting that the indemnification provision does not apply to the conduct at issue here. YTZ claims, without basis or citation, that "the indemnification provision concerns instances where the Offers are unauthorized or where a promotional offer is not honored by the issuer and Plaintiff is named in a false advertising claim." (*See* Mot. at 16.) But this is contrary to the plain language of the provision, which says nothing about false advertising or unauthorized Offers, and instead indemnifies SAH for "any and all" claims "relating to or arising out of" "the promotion and distribution of the Offers." (*See* Compl. Ex. 1 ¶ 8.) Indeed, the Master Agreement expressly discloses that SAH uses the Toolbar—about which QuiBids complains—"to promote the Offers." (*See id.* ¶ 6.) Therefore, YTZ's convoluted argument that the indemnification provision does not apply to QuiBids' claims regarding the Toolbar must fail.

### 2. The Indemnification Provision Covers any Negligent Conduct of SAH.

An "otherwise unambiguous" indemnity provision indemnifies the indemnitee from its own negligence even in the absence of a specific reference to negligent conduct. *Public Serv. Co. v. United Cable Television of Jeffco, Inc.*, 829 P.2d 1280, 1284 (Colo. 1992). In *Public*

*Service*, the indemnitor agreed to "indemnify and hold harmless" the indemnitee from and against "all claims, liabilities, causes of action, or other legal proceedings." *Id.* at 1283. The Supreme Court of Colorado held that this provision "indicates an intent to include claims arising from [the indemnitee's] negligence." *Id.* The court specifically found that the use of the word "liabilities" indicates it covers instances in which the indemnitee is legally liable for damages (including for its own negligence). *Id.* The court further found that the "breadth of the language 'in any way' supports an interpretation that the parties intended that [the indemnitee] be indemnified for its own negligence." *Id.* The court saw "no reason why commercial contracts, entered into by two sophisticated parties following full negotiation, should be construed in a manner which frustrates the obvious intent of the parties." *Id.* at 1285.

Here, the indemnification provision at issue evidences an intent to include claims arising out of SAH's negligence. The provision here is nearly identical to the provision in *Public Service*. Under the Master Agreement, YTZ must "indemnify and hold harmless" SAH "from *any and all* claims, losses, *liabilities*, damages, costs, and expenses of any nature (including reasonable attorneys fees) relating to or arising out of . . . the promotion and distribution of the Offers." (*See* Compl. Ex. 1 ¶ 8 (emphasis added).) Similar to *Public Service*, here the use of the words and phrases "any and all," "liabilities," and "damages" clearly and unambiguously evidences an intent for SAH to be indemnified for its own negligence.

YTZ's reliance on *Williams v. White Mountain Construction Co.* is unavailing. That case involved an oral contract in which the purported indemnitor allegedly stated, "Don't worry about it—we will take care of it if anything happens." *Williams v. White Mountain Constr. Co.*, 749 P.2d 423, 426 (Colo. 1988). The court there held that this ambiguous statement was not

sufficient to create an express contract of indemnity. *Id.* Here, unlike *Williams*, the parties entered into an express written agreement whereby YTZ agreed to "indemnify and hold harmless [SAH] and its officers, directors, employees and agents from any and all claims, losses, liabilities, damages, costs and expenses of any nature." (*See* Compl. Ex. 1 ¶ 8.) As the Colorado Supreme Court held in *Public Service*, such a provision is sufficient to indemnify SAH for its own negligence. *See Public Serv. Co.*, 829 P.2d at 1284 (distinguishing *Williams* and noting that "[t]he contract here was in writing, and was the result of arms-length negotiations between two sophisticated corporations").

Despite YTZ's suggestion to the contrary, SAH does not seek indemnification for any intentional or fraudulent conduct. SAH's Complaint sought declaratory relief with respect to all claims that QuiBids was asserting against SAH, which included claims for negligence, negligence per se, unjust enrichment, and restitution, among others. (*See* Compl. ¶ 35.) Moreover, the Complaint expressly denies liability as to all claims, and further alleges that SAH fully disclosed the conduct about which QuiBids complained. (*See, e.g.*, Compl. ¶¶ 20, 25-29.) Whether SAH's conduct was intentional or fraudulent such that YTZ has no obligation to indemnify SAH is not appropriate for resolution on a motion to dismiss, especially where the facts alleged in the Complaint—which the Court must accept as true at this stage—deny any intentional or fraudulent conduct.

In sum, SAH's claim for indemnity cannot be dismissed on the basis that the indemnification agreement does not cover the conduct at issue.

-15-

### C. YTZ Must Indemnify SAH for YTZ's Own Wrongful Conduct That Contributed to the Claims Asserted by QuiBids.

Even if the Master Agreement did not indemnify SAH for its own wrongful conduct (although it does), the Complaint plainly alleges fault on the part of YTZ for the claims asserted by QuiBids. The redirect feature of the Toolbar, which formed the basis for QuiBids' claims, was fully disclosed to YTZ. (*See* Compl. ¶¶ 26-28.) In addition to disclosures within the Master Agreement, SAH performed live demonstrations of the Toolbar's functionality for YTZ. (*See id.* ¶ 28.) Moreover, YTZ touts on its website the fact that it has been "work[ing] with redirect traffic" for "over 5 years," suggesting that it is familiar with and understands the redirect functionality of the Toolbar. (*See id.*) SAH did not have any direct contractual relationship with QuiBids. (*See id.* ¶ 14.) Rather, SAH advertised on behalf of QuiBids through its agreements with YTZ and other third parties. (*See id.*) If any party was obligated to disclose the redirect feature of the Toolbar to QuiBids, it was YTZ—the party who had the direct relationship with QuiBids. In other words, SAH is not seeking indemnification for its *own* wrongful conduct; it is seeking indemnification for *YTZ*'s wrongful conduct which gave rise to QuiBids' claims against SAH. Therefore, SAH's claim for indemnity is proper regardless of whether YTZ must indemnify SAH for its own negligence.

In short, the Complaint sufficiently alleges a claim against YTZ for express contractual indemnity under the Master Agreement.

### VII. CONCLUSION

WHEREFORE, Plaintiff Belcaro Group, Inc. d/b/a ShopAtHome.com prays that the Court deny YTZ's motion to dismiss in its entirety, and grant SAH such other and further relief as the Court deems just and proper.

Respectfully submitted this 3rd day of September, 2013.

        Jennifer A. Golinveaux
        **WINSTON & STRAWN LLP**
        101 California Street
        San Francisco, CA  94111
        jgolinveaux@winston.com
        (415) 591-1506 (Telephone)
        (415) 591-1400 (Facsimile)

        Michael S. Elkin
        **WINSTON & STRAWN LLP**
        200 Park Avenue
        New York, NY  10166-4193
        melkin@winston.com
        (212) 294-6700 (Telephone)
        (212) 294-4700 (Facsimile)

        Erin R. Ranahan
        **WINSTON & STRAWN LLP**
        333 S. Grand Avenue
        Los Angeles, CA  90071-1543
        eranahan@winston.com
        (213) 615-1700 (Telephone)
        (213) 615-1750 (Facsimile)

        **FAIRFIELD AND WOODS, P.C.**

        By:   *s/ John M. Tanner*
                John M. Tanner
        John M. Tanner
        1700 Lincoln Street, Suite 2400
        Denver, CO  80203-4524
        Telephone:  (303) 830-2400
        Facsimile:  (303) 830-1033
        Email:  jtanner@fwlaw.com

        Attorneys for Plaintiff
        BELCARO GROUP, INC., d/b/a
        SHOPATHOME.COM

# CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2013, I electronically filed the foregoing PLAINTIFF BELCARO GROUP, INC.'S RESPONSE TO DEFENDANT YTZ INTERNATIONAL, INC.'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(2), 12(b)(5) AND 12(b)(6) with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

| Counsel | Party |
| --- | --- |
| Gregory Thomas Metcalfe<br>gmetcalfe@gablelaw.com<br><br>John Michael Krattiger<br>jkrattiger@gablelaw.com<br><br>Steven C. Janiszewski<br>sjaniszewski@riggsabney.com | *Counsel for Defendants Quibids LLC and Quibids Holdings LLC* |
| Richard Newman<br>rnewman@hinchnewman.com<br><br>Charles Mitchell<br>cmitchell@jinslaw.com | *Counsel for Defendant Rapid Response Marketing LLC* |
| Eugene Rome<br>erome@romeandassociates.com<br><br>Lucas T. Ritchie<br>lritchie@joneskeller.com<br><br>Aaron D. Goldhamer<br>agoldhamer@joneskeller.com | *Counsel for Specially Appearing Defendant YTZ International Inc.* |

    s/ Erin R. Ranahan
    Erin R. Ranahan

-18-