

## GABLE GOTWALS
C O U N S E L

Greg T. Metcalfe
405.235.5578
GMetcalfe@gablelaw.com

March 7, 2013

Claudia Braunstein, Registered Agent
Belcaro Group, Inc.
d/b/a ShopAtHome.com
7100 E Belleview, Ste. 208
Greenwood Village, CO 80111
**Via Certified Mail, Return Receipt Requested**

    Re:    Demand of QuiBids (Confidential Subject to Fed. R. Evid. 408 & 12 O.S. § 2408)

Dear Ms. Braunstein:

    Be advised that QuiBids LLC and QuiBids Holdings LLC ("QuiBids") have prepared a Petition against Belcaro Group, Inc., d/b/a ShopAtHome.com ("ShopAtHome"), due to the significant economic harm caused to QuiBids by ShopAtHome's fraudulent conduct. Specifically, ShopAtHome has engineered its Browser App to hijack direct/organic traffic intended for QuiBids.com and reroute that traffic through ShopAtHome's servers in order to falsely and fraudulently register that direct/organic traffic as having been procured by the advertising efforts of ShopAtHome. ShopAtHome is maliciously profiting from this scheme by taking what would have been direct/organic traffic for QuiBids.com and making it appear to be affiliate traffic so that ShopAtHome can falsely and fraudulently charge affiliate networks for this traffic, the ultimate cost of which is borne by QuiBids. In short, due to the conduct of ShopAtHome, QuiBids is being charged for conversions that ShopAtHome did not, in fact, procure. If that is not bad enough, ShopAtHome's Browser App has also been observed to re-route traffic intended for QuiBids.com to one of QuiBids' direct competitors. This conduct tortiously interferes with QuiBids' business relationships and legitimate economic expectations.

    Fraudulently charging for direct traffic is particularly egregious with respect to QuiBids because QuiBids engages in a fair amount of television and other conventional advertising. This conventional advertising generates direct/organic traffic. But, the traffic generated by conventional advertising is far from free. QuiBids pays significant sums to the advertisers to procure this traffic. When ShopAtHome hijacks, redirects, and then charges for this direct/organic traffic, ShopAtHome causes QuiBids to be charged twice for the same traffic. ShopAtHome's fraudulent conduct has caused significant economic harm to QuiBids.

**EXHIBIT**

*A*

Belcaro Group, Inc.,
d/b/a ShopAtHome.com
March 7, 2013
Page 2

Enclosed is a copy of the Petition QuiBids has prepared, which outlines the harm ShopAtHome has inflicted on QuiBids. Moreover, following some discovery, we anticipate having sufficient evidence to add a claim for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. Though QuiBids is extremely frustrated by the conduct of ShopAtHome and is quite anxious to recover its money, I have encouraged QuiBids to permit a small window of time to attempt to negotiate a settlement. If you are interested in discussing the possibility of settlement, please contact me by close of business on March 21, 2013. We will not file suit prior to that date.

Pursuant to the Oklahoma Rules of Civil Procedure, the Federal Rules of Civil Procedure, Oklahoma common law and Federal common law, QuiBids demands that ShopAtHome take all necessary measures to ensure the preservation of all documents, emails, computer code, accounting records and all other documents and evidence for subsequent litigation. *See generally Barnett v. Simmons*, 2008 OK 100, ¶ 21, 197 P.3d 12 ("[S]poliation occurs when evidence relevant to prospective civil litigation is destroyed, adversely affecting the ability of a litigant to prove his or her claim."); *US ex rel. Koch v. Koch Industries, Inc.*, 197 F.R.D. 463, 482 (N.D. Okla. 1998) ("A litigant has a duty to preserve evidence that it knows or should know is relevant to imminent or ongoing litigation."). All relevant and discoverable documents and evidence must be collected and/or preserved in the form in which they currently exist, in both hard copy and electronic form. Any regular business practice that includes the destruction and/or deletion of any electronic or paper document must cease immediately in order to preserve all relevant documents. All document destruction policies should be suspended, and any auto-deletion features of email servers/programs should be disabled. Failure to comply with the preservation obligation could result in sanctions or adverse inference instructions at trial.

Please contact us by March 21, 2013, if you wish to attempt to negotiate a settlement.

Sincerely,

Greg T. Metcalfe
For the Firm

GTM:mam
enclosure

cc:   Ashley Smith



Confidential Draft Petition
Provided For Purposes of
Settlement Negotiations
Subject to Fed. R. Evid. 408
& 12 O.S. § 2408

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

QuiBids LLC, an Oklahoma Company, and
QuiBids Holdings LLC, a Delaware Company,

        Plaintiffs,

v.

Belcaro Group, Inc., d/b/a ShopAtHome.com, a
Colorado Company,

        Defendant.

Case No.

**Jury Demand**

### PETITION

QuiBids LLC and QuiBids Holdings LLC (hereinafter collectively referred to as "QuiBids" or "Plaintiff") for their action against Defendant Belcaro Group, Inc., d/b/a ShopAtHome.com ("ShopAtHome.com" or "Defendant"), allege, upon information and belief:

#### INTRODUCTION[1]

1.    ShopAtHome.com is an internet affiliate marketing company that generates revenue by charging merchants to drive new traffic to the merchants' websites. This lawsuit is about ShopAtHome.com's act of defrauding QuiBids (and likely many other merchants). When a computer user types "QuiBids.com" directly into the address bar of a web browser, the web browser immediately loads the QuiBids.com webpage. This is an example of "direct" traffic, which is traffic initiated directly by the user, on the user's own volition. It is not procured by the advertising efforts of ShopAtHome.com.

2.    ShopAtHome.com induces its users to install a browser app, which is computer

---

[1] The subtitles are provided merely for the benefit of the reader. All allegations herein are inclusive and incorporated within each and every subsection and count within the Petition.

malware that hijacks this direct traffic and first reroutes it through ShopAtHome.com's servers before then causing the user to land at QuiBids.com by way of ShopAtHome.com's affiliate marketing link – all so ShopAtHome.com can falsely register the traffic as having been procured by ShopAtHome.com's marketing efforts. Through use of this malware, ShopAtHome.com is charging for traffic that it did not procure for QuiBids. Perhaps even more harmful, this malware at times hijacks a user who clicks on a link for QuiBids or types "QuiBids.com" into the address bar and reroutes the user to the website of one of QuiBids' competitors! In this way, Defendant ShopAtHome.com is actually depriving QuiBids of sales, revenue, and customers.

3.      ShopAtHome.com is defrauding QuiBids by charging for traffic that ShopAtHome.com did not procure for QuiBids and by robbing QuiBids of traffic and sending that traffic to one of QuiBids' competitors. QuiBids brings this action to, *among other things*, (a) recover from ShopAtHome.com for the significant economic harm that ShopAtHome.com has caused to QuiBids, (b) recover punitive damages and civil penalties, (c) recoup its costs and attorney fees, and (d) obtain an injunction preventing ShopAtHome.com from continuing this egregious behavior.

4.      ShopAtHome.com runs advertisements and promotions for some of the world's largest merchants. On information and belief, ShopAtHome.com may be similarly victimizing some, if not many, of these merchants, such as: Wal-Mart, Target, Toys-R-Us, Kmart, Old Navy, Disney, Kohl's, Lowes, Staples, Nordstrom, JC Penny, Walgreens, Best Buy, DirecTV, Fandango.com, The Hartford, ABC, Expedia.com, Monster.com, Simon & Schuster, Quicken Loans, TurboTax, Intuit, American Airlines, American Greetings, Yahoo, AOL, NASCAR, Bed Bath & Beyond, Apple, Overstock.com, Barnes & Noble, BBC, Kayak.com, H&R Block, Orbitz.com, Facebook, Bose, British Airways, Business Week, Cabelas, Lego, GEICO, Home

Depot, Lowes, Walgreens, CBS, eBay.com, The Chicago Tribune, Circuit City, Clarion Hotels, Hotels.com, Priceline.com, LendingTree.com, CNET.com, CNN, Comfort Inn & Suites, Orbitz.com, Choice Hotels, Expedia.com, AT&T, Tivo, Delta, Dell, Discover Cards, Travelocity.com, Verizon, Sears, Hallmark, EconoLodge, Land's End, Citi Cards, Esurance.com, FTD.com, AARP, Gateway, Adobe, Marriott, Google, Kodak, Bloomingdale's, The Los Angeles Times, Macy's, Dillard's, Gap, GNC, Sony, Nutrisystem, Radio Shack, Reebok, Zales, Children's Place, Mrs. Field's, MSN, Whitepages.com, Staples, Netflix, NPR, The New York Daily News, The New York Post, The New York Times, Hotwire.com, American Express, Radisson, Restoration Hardware, Reuters, The Sharper Image, Canon, Stamps.com, Toshiba, Safeway, CompUSA, Omaha Steaks, Sallie Mae, T-Mobile, Hanes, The Register, The Sun, Time Life, Wired, The Wall Street Journal, Capital One, Finish Line, Game Stop, Hilton, Sirius, Weight Watchers and numerous other large and small businesses.

     5.    For many of these merchants, ShopAtHome.com places coupon ads for the merchants through an affiliate network, such as Commission Junction, LinkShare or the Google Affiliate Network. Thus, the merchants may be entirely unaware they are being charged for traffic that ShopAtHome.com did not, in fact, procure.

### GENERAL ALLEGATIONS

     6.    Plaintiff QuiBids LLC is an Oklahoma Limited Liability Company with its principal place of business in Oklahoma City, Oklahoma.

     7.    Plaintiff QuiBids Holdings LLC is a Delaware Limited Liability Company that is registered in Oklahoma with its principal place of business in Oklahoma City, Oklahoma.

     8.    Defendant Belcaro Group, Inc., d/b/a ShopAtHome.com, is a Colorado corporation with its principal place of business in Colorado.

     9.    Defendant transacts business on a regular basis in the State of Oklahoma.

Defendant's contacts with Oklahoma are pervasive.

10.     The claims expressed herein arise out of Defendant's actions within the State of Oklahoma.

11.     Defendant has purposefully availed itself of the privilege of doing business and conducting activities in the State of Oklahoma.

12.     Exercise of jurisdiction over Defendant is consistent with Oklahoma's long arm statute and Fourteenth Amendment Due Process.

### DEFENDANT'S AFFILIATE MARKETING PROGRAM

13.     According to Defendant, "ShopAtHome.com is one of the largest websites offering free online coupons, grocery coupons, cash back rewards, free samples, restaurant coupons and contests. The site is unique from other online deal sites because it gives cash back to shoppers for purchases made through ShopAtHome.com."[2]

14.     ShopAtHome.com generated $7.9 million in revenue in 2008 and $77 million in revenue in 2011, for a staggering growth of 877% over a three year period.[3]

15.     According to Defendant, "ShopAtHome.com has experienced unbelievable growth year-over-year since it was launched in 1986. Over the past year, it's [sic] monthly visits have grown from 19 million to over 37 million with no signs of slowing down."[4]

16.     Defendant reports receiving 12 million unique visitors each month.[5]

17.     Defendant has many millions of users with whom it contracts.[6] Defendant's users

---

[2] (http://www.ShopAtHome.com/sahpages/about.aspx last visited 10/30/2012.)

[3] (http://www.inc.com/inc5000/profile/shopathomecom last visited 2/14/2013.)

[4] (http://www.ShopAtHome.com/sahpages/about.aspx last visited 10/30/2012.)

[5] (http://www.shopathome.com/sahpages/about.aspx last visited 2/14/2013.)

engage in retail shopping activities through Defendant's website and through Defendant's Shopping Toolbar. Pursuant to Defendant's contract with its users, Defendant pays its customers cash rebates in exchange for its users engaging in retail transactions through the "deals" and promotions recommended by Defendant. Rebate checks are sent to the users as frequently as once per month.

18.     Defendant has contracted with many thousands of Oklahoma citizens in such a fashion.

19.     Part of Defendant's business model includes selling advertising and/or procuring new traffic or new transactions for merchants.[7]

20.     Defendant publishes or hosts advertising for other companies and displays this advertising to its users. When Defendant's users click on advertising published or hosted by Defendant (often in the form of a deal, coupon or promotion), the user is redirected to the advertiser's website. Defendant ensures that all "click-through traffic" is logged so that Defendant can then charge for the traffic Defendant procured for advertisers.

21.     Advertisers promote themselves through Defendant's website in order to receive new customers or purchases that they would not have otherwise received.

22.     Defendant in turn charges a fee for the traffic that Defendant has directed to the advertiser.

23.     Generally speaking, such fees are often based on the customer making a purchase with the advertiser or taking some other pre-defined action. When a customer referred by Defendant makes a purchase (or takes some other pre-defined action), this is known as an

---

[6] (http://www.ShopAtHome.com/sahpages/terms-and-conditions.aspx last visited 10/25/2012.)

[7] (http://www.ShopAtHome.com/Advertise/ last visited 2/14/2013.)

"action" or "conversion." The charge to the advertiser is, therefore, based on a cost per action ("CPA").

24.     Plaintiff owns and operates the website QuiBids.com, a "fast-paced auction website" where users are able to purchase products "similar to the 'Going Once…Twice…SOLD' approach of auctions."[8]

25.     Beginning in 2010 and through the present, Defendant has published advertising links to QuiBids.com.

26.     QuiBids has been charged for traffic originating from Defendant on a CPA model.

## DEFENDANT'S "SHOPPING TOOLBAR"

27.     Defendant induces users of its website to download and install its browser app (hereinafter referred to as the "Shopping Toolbar").

28.     According to Defendant, "[t]he Toolbar is a free, easy-to-use shopping assistant that allows you to take the power of ShopAtHome.com with you anywhere on the Web. When you install the Toolbar, you are adding a whole new set of functions to your Web browser. For example, you can use the Toolbar to perform a ShopAtHome.com search from any site on the Web, or to search for specific products or coupons on any given page. The ShopAtHome.com Toolbar also offers users exciting features such as text alerts whenever Sites that YOU choose have a sale or special!"[9]

29.     Defendant has induced millions of its users to install the Shopping Toolbar on the web browsers of their computers. Defendant has induced many thousands of Oklahoma citizens to install the Shopping Toolbar on the web browsers of their computers located in Oklahoma.

---

[8] (http://www.quibids.com/en/company/ last visited 2/14/2013.)

[9] (http://www.ShopAtHome.com/pages/faqs.aspx last visited 2/14/2013.)

6

30.    When a user of ShopAtHome.com installs Defendant's Shopping Toolbar on the user's computer, the Shopping Toolbar appears as a seemingly-innocuous toolbar strip or icon added to the user's web browser, such as Internet Explorer.



Shopping Toolbar installed on Internet Explorer.

For close-up views of the browser window, *see* Exhibit 1, Fig. 1.

31.    Without installation of the Shopping Toolbar, if a consumer types "QuiBids.com" into the address bar of his or her web browser, the consumer will be routed directly to Plaintiff's website, QuiBids.com. This is called "direct" traffic.



For a close-up view of the browser window, *see* Exhibit 1, Fig. 2.

32.    If a user had previously been to QuiBids.com and saved QuiBids.com as a "bookmark" or "favorite," the user could return to QuiBids.com by clicking on that saved link. This is also a form of direct traffic.

33.    If a user searches for "QuiBids" in a search engine, such as Google or Bing, a link to QuiBids.com will return as a search result (in virtually every case as the "top" result). QuiBids is also returned as a result if a user searches for "online auction site" or many other forms of search criteria. When the user clicks on the search result for QuiBids.com, this is also a form of direct traffic. (This is occasionally referred to as "organic search" traffic.)

34.    In each of these cases, the user arrived at QuiBids directly through the user's own volition. This may have been because the user saw a news story about QuiBids, heard about QuiBids from a friend, was seeking out an online auction site, or saw a television commercial purchased by QuiBids. Whatever sparked the user's interest to arrive at QuiBids directly, it was not the advertising efforts of ShopAtHome.com.

35.    If a user arriving at QuiBids.com from direct traffic makes a purchase on

8

QuiBids.com, there should be no charge to QuiBids for "CPA" marketing because the consumer did not arrive at QuiBids.com by way of the activities of Defendant or other affiliate marketers.

36.     Once a ShopAtHome.com user installs Defendant's Shopping Toolbar, the behavior of the web browser changes as a direct result of the manner in which Defendant engineered its Shopping Toolbar.  After installation, if the user types "QuiBids.com" into the address bar of the web browser, Defendant's Shopping Toolbar intercepts and hijacks what would otherwise be direct traffic to QuiBids.com, and first routes the traffic through Defendant's servers.  By rerouting direct traffic through Defendant's servers, Defendant makes it appear to advertisers, such as QuiBids.com, as if the consumer arrived at QuiBids.com by way of display ads published by Defendant.  The following images depict what occurs if a user with the Shopping Toolbar installed types "QuiBids.com" into the address bar of Internet Explorer:



First redirect of hijacked traffic.

Second redirect of hijacked traffic.

QuiBids.com finally accessed, but the user "lands" on ShopAtHome's affiliate link, which is used to register the traffic as having originated from ShopAtHome's advertising efforts.

For close-up views of the browser window, *see* Exhibit 1, Fig. 3.1, 3.2, and 3.3.

37.     After first hijacking and rerouting the direct traffic through ShopAtHome's servers, Defendant ultimately causes, by virtue of its Shopping Toolbar, the user to "land" at QuiBids.com by way of ShopAtHome's affiliate link. The affiliate link, which is appended to the www.quibids.com URL,[10] is part of the mechanism used to register the traffic as having originated from ShopAtHome's advertising efforts.

38.     If hijacking direct traffic and falsely reporting it as traffic procured by Defendant was not bad enough, at times the Shopping Toolbar actually intercepts traffic directed to QuiBids.com and routes it instead to one of QuiBids' competitors! Defendant is literally robbing

---

[10] (The *Uniform Resource Locator (URL)* is the global address of documents and other resources on the World Wide Web, http://www.webopedia.com/TERM/U/URL.html last visited 2/14/2013.)

traffic from QuiBids, thereby depriving QuiBids of sales, revenue and customers.

39.     Even in the event of a user arriving at QuiBids.com through direct traffic, Defendant also installs a "tracking cookie" in the web browsers of its users for the purpose of tracking the users' transactions with QuiBids and other retailers.

40.     Defendant engineered the Shopping Toolbar to continue hijacking and redirecting direct traffic even after a user disables or uninstalls the Shopping Toolbar.  During the uninstall process, the Shopping Toolbar leaves orphaned code on the computer that will continue hijacking and redirecting direct traffic through the ShopAtHome.com servers and affiliate links, continuing to allow ShopAtHome.com to fraudulently charge for traffic that it did not procure.

41.     When performing an uninstall of the Shopping Toolbar, the user is presented with a deliberately confusing question regarding whether, notwithstanding uninstallation of the Shopping Toolbar, the user wishes to continue receiving "cashback."  The "continue with cashback" option is selected by default.  If the user ignores this question (leaving the default selected) or expresses a desire to continue receiving money from Defendant, the Shopping Toolbar does not completely uninstall.  The Shopping Toolbar visibly disappears, but it leaves behind orphaned code that continues hijacking and redirecting traffic through the ShopAtHome.com servers and affiliate links, continuing to allow ShopAtHome.com to fraudulently charge for traffic that it did not procure.  Moreover, once the user completes the uninstall process, there is no obvious way to ever uninstall the orphaned code from the computer. It is impossible to go back and undue this selection once the uninstall is completed.

42.     Thus, the hijacking behavior continues to occur when the Shopping Toolbar has been uninstalled or disabled, as demonstrated by the following images:



For close-up views of the browser window, *see* <u>Exhibit 1</u>, Fig. 4.1 and 4.2.

43.    Though this Petition has focused on the most popular web browser, Internet Explorer, Defendant's Shopping Toolbar exhibits similar behavior on other popular web

12

browsers, such as Google's Chrome browser and Mozilla's Firefox browser.

44.    In fact, the behavior of the Shopping Toolbar when acting on Chrome is perhaps even more insidious because the hijack and redirect is performed entirely in the background and is not detectable to the user. With Chrome, the Shopping Toolbar accomplishes the hijack and redirect through the use of an "iFrame" inserted by the Shopping Toolbar code.

45.    The following image depicts the background behavior of the Shopping Toolbar extension when a user goes directly to QuiBids.com in Google Chrome. On the left is the Google Chrome browser. On the right is the Google Chrome developer tools providing a view of the background activity of the Shopping Toolbar that cannot be seen directly by the user:



ShopAtHome.com first loads a frameset. The traffic is then routed through ShopAtHome's servers, with the user finally landing on the affiliate link by which ShopAtHome.com registers having sent the traffic.

For close-up views of the log window, *see* Exhibit 1, Fig. 5.1.

46.    The following image represents a different view of the same activity caused by the Shopping Toolbar in Google Chrome when a user goes directly to QuiBids.com. This view demonstrates the background traffic from oldest on top to newest on bottom. This log

demonstrates that, when a user types "QuiBids.com" into the address bar and presses enter, the Shopping Toolbar first directs the traffic through ShopAtHome.com and finally lands on the affiliate link by which ShopAtHome.com registers having sent the traffic. All of this occurs in the background and is undetectable to the user.



For close-up views of the log window, *see* <u>Exhibit 1</u>, Fig. 5.2.

47.   Defendant is injecting malicious code onto the computers of millions of consumers, and causing that code to wrongfully, fraudulently and maliciously hijack direct traffic intended for advertisers for whom Defendant publishes advertising, with the result being that QuiBids, and potentially thousands of other retailers, are being charged for conversions and/or traffic that Defendant did not, in fact, procure for, or direct to, advertisers such as QuiBids.

48.   Defendant is wrongfully charging for a transaction to which Defendant added no value.

49.     Given that Defendant profits from hijacking direct traffic, QuiBids is a particularly lucrative source of revenue for Defendant among merchants of QuiBids' size. Unlike many merchants of QuiBids' size, QuiBids engages in a variety of conventional advertising methods such as television commercials and other advertising. Through its conventional advertising program, QuiBids generates significant direct traffic.

50.     This direct traffic generated through conventional advertising comes at a cost. QuiBids pays significant sums to conventional advertisers to procure this traffic. When ShopAtHome hijacks, redirects, and then charges for this direct/organic traffic, ShopAtHome is causing QuiBids to be charged twice for the same traffic – once for the conventional advertising that led to the direct traffic and once for Defendant's fraudulent hijack of the direct traffic.

51.     Soon after QuiBids' suspicions were first aroused that it was being fraudulently charged for Defendant's hijacking of direct traffic, QuiBids terminated its relationship with the affiliate network through which Defendant was charging QuiBids for the hijacked traffic. Defendant's conduct is so egregious that Defendant shortly thereafter began charging Defendant for hijacked traffic via a different affiliate network with whom QuiBids places advertising.

52.     Upon information and belief, (1) the Shopping Toolbar installs and/or modifies over 170 files and thousands of registry entries; (2) when a user disables the Shopping Toolbar, URLs continue to be hijacked and appended, users continue to be presented with coupon notices and offers, and a watcher service continues to run in the background of the computer; (3) certain files added to the system during the installation process are NOT removed from the system when the Shopping Toolbar is uninstalled; and (4) functions of the toolbar related to the assignment of the Affiliate ID to a URL, such as QuiBids.com, continue, even after the uninstall process is complete.

53.     Not only are ShopAtHome.com's actions fraudulent and harmful to merchants, but they cause ShopAtHome.com to be in violation of the terms and conditions of Google's affiliate network and of Google's AdWords program, perhaps the largest web-based advertising program in the world.

54.     According to the terms of Google's affiliate network program:

> Conversions (purchases or other qualified actions) generated through your ads must result from genuine user interest. Any method that generates invalid conversions, or uses artificial means to emulate actual purchases or other qualified actions, is strictly prohibited. These methods include but are not limited to using an expired or stolen credit card for purchases, buying and returning items to earn commissions, submitting registrations with false information, self-inflating, duplicating or stealing registrations, or using a device, program, robot, or other means to emulate actual purchases or other qualified actions.[11]

55.     Defendant's Shopping Toolbar also violates additional terms and conditions that apply to Google's affiliate partners that make use of software applications:

> **3.1 Prohibited Behavior.**   Your Software Application may not engage in deceptive, unfair, harassing or otherwise annoying practices. For example, the Software Application may not: . . . (f) engage in activity that violates any applicable law or regulation.
>
> **3.2 Interference with Referrals**. Your Software Application must not interfere with, or seek to improperly influence, the referral of an end user to the web site of a Google Affiliate Network advertiser unless the end user knowingly and explicitly consents to that behavior by taking an affirmative action after being notified each and every time.
>
> **3.3 Notification/No Automatic Redirection**. Your Software Application must explicitly notify the end user each and every time of any opportunity to redirect to a participating advertiser site. Automatic redirection to a participating advertiser web site, regardless of the traffic source or URL being visited by the end user, is strictly prohibited. Software Applications may only redirect end users to a participating advertiser site after 1) notifying the end user in a clear and unambiguous manner, and 2) receiving explicit consent from the end user in the form of affirmative clickthrough.

---

[11] (http://support.google.com/affiliatenetwork/publisher/answer/1182198 last visited 02/18/2013.)

**3.4 Non End User Initiated Events**. Your Software Application may not use methods to generate non end user initiated impressions, clicks, or transactions. All click events must be initiated by an affirmative end user action.[12]

56.    Moreover, the continuing actions of Defendant's Shopping Toolbar to hijack and redirect even after a user has attempted to disable or uninstall the software further violates the terms of Google's affiliate program:

**6. Deactivation**. Your Software Application must not impair an end user's ability to change any preferences or settings set by the Software Application in accordance with the way that such preferences or settings ordinarily may be changed by the applicable Software Application. Once disabled by an end user, your Software Application may not be re-enabled without an affirmative action by the end user to explicitly re-enable your Software Application. Accordingly, no use, update, installation or re-enablement of a separate Software Application, and no code downloaded as a result of browsing a Web site, may operate to re-enable your Software Application. Your Software Application must permit end users to uninstall it (in the customary place the applicable operating system has designated for adding or removing programs, e.g., Add/Remove Programs control panel in Windows) in a straightforward manner, without undue effort or skill. In addition, your Software Application, when running, must provide (in an easily found location) clear and concise instructions on how it may be uninstalled. Once uninstalled, your Software Application must not leave behind any functionality or design elements, and all setting changes made by the application, but not explicitly agreed to by the end user, should be reversed to the extent practicable.[13]

57.    Defendant also violates the  Google AdWords Advertising Program Terms:

**Prohibited Uses; License Grant; Representations and Warranties.** Customer shall not, and shall not authorize any party to: (a) generate automated, fraudulent or otherwise invalid impressions, inquiries, conversions, clicks or other actions; . . . or (c) advertise anything illegal or engage in any illegal or fraudulent business practice. . . . Customer represents and warrants that (y) all Customer information is complete, correct and current; and (z) any Use hereunder and Customer's Creative, Targets, and Customer's Services will not violate or encourage violation of any applicable laws, regulations, code of conduct, or third party rights . . . .

---

[12] (http://www.google.com/ads/affiliatenetwork/publisher/software_guidelines.html last visited 02/18/2013.)

[13] (http://www.google.com/ads/affiliatenetwork/publisher/software_guidelines.html last visited 02/18/2013.)

Violation of the foregoing may result in immediate termination of this Agreement or customer's account without notice and may subject Customer to legal penalties and consequences.[14]

58.     As of August 2011 and before, QuiBids' servers were hosted in Oklahoma.

59.     Defendant, through its Shopping Toolbar installed on many thousands of computers belonging to Oklahoma citizens, hijacked direct QuiBids.com traffic originating in Oklahoma, redirected that traffic to Defendant's servers, then permitted that traffic to direct to QuiBids' Oklahoma-based servers, often resulting in conversions for which Defendant could wrongfully claim responsibility and therefore receive payment.

60.     Through Defendant's wrongful conduct, QuiBids was billed in Oklahoma for fraudulent charges reflecting traffic to QuiBids.com that Defendant did not, in fact, procure for QuiBids.

61.     Defendant reached into Oklahoma and directed its actions towards Oklahoma to fraudulently obtain money from an Oklahoma company.

## FIRST COUNT
### FRAUD

62.     Defendant has made a series of material representations from 2010 to present. Namely, Defendant has represented that it procured click-through traffic for QuiBids by way of consumers who purportedly clicked on QuiBids.com marketing links published and/or maintained by Defendant.

63.     The representations were material because the content of the representations formed the basis of the sum charged to Plaintiff and the basis of Defendant's proceeds from QuiBids.

---

[14] (https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html last visited 02/18/2013.)

64.    In the case of Defendant's users with Defendant's Shopping Toolbar installed, when those users typed "QuiBids.com" into the address bar of their browsers (or engaged in some other form of direct traffic), Defendant intercepted and hijacked what would have otherwise been direct traffic, and rerouted the traffic first through Defendant's servers and then through an affiliate link or links, for the purpose and to the effect of falsely representing hijacked direct traffic as click-through traffic originating from QuiBids.com marketing links published and/or maintained by Defendant.

65.    In other words, Defendant falsely represented hijacked direct traffic to be click-through traffic procured for QuiBids by Defendant.

66.    Defendant purposefully designed and engineered its Shopping Toolbar to hijack and reroute direct traffic first through Defendant's servers and then through an affiliate link or links so that Defendant can charge QuiBids.com and other advertisers for traffic that Defendant did not, in fact, procure.

67.    Defendant knowingly created this behavior so that Defendant could increase its revenues at the expense of QuiBids. Defendant knew it was misrepresenting hijacked direct traffic as click-through traffic, or at a minimum the representation was made recklessly without knowledge of the truth.

68.    Defendant reported its hijacked direct traffic to the affiliate networks that had been engaged by QuiBids with the intention that QuiBids pay for the "conversions" that resulted from Defendant's hijacked direct traffic.

69.    Defendant reported the hijacked direct traffic to the affiliate networks on a real-time basis between 2010, when Defendant first began hijacking direct traffic intended for QuiBids.com, and the present.

19

70.     Defendant reports the hijacked direct traffic by sending the intercepted and rerouted direct traffic first through its servers and then from its servers through an affiliate link. With this technique, Defendant represents, on a real-time basis, each hijacked direct hit as a hit procured by Defendant.

71.     Defendant reported the hijacked direct traffic in such a manner that it would be impossible for QuiBids to distinguish between that traffic which had been genuinely procured as click-through traffic and that hijacked direct traffic which had been intentionally misrepresented as click-through traffic.   Defendant's reports to the affiliate network included a mixture of genuine traffic and fraudulent traffic.

72.     Because of Defendant's concealment, QuiBids was ignorant of the fact that Defendant was falsely reporting hijacked direct traffic as click-through traffic.

73.     QuiBids had a right to rely on Defendant accurately reporting the traffic it actually procured for QuiBids.

74.     Defendant's reports were sent to the affiliate networks directly from Defendant's servers.

75.     QuiBids acted upon Defendant's misrepresentations and paid sums of money in exchange for conversions that Defendant did not, in fact, procure for QuiBids.

76.     QuiBids has suffered injury by being charged for conversions that were attributable to what would have been direct traffic, but was wrongfully hijacked by Defendant.

77.     Defendant designed its scheme in such a manner as to obscure and conceal the exact amount of conversions wrongfully hijacked by Defendant.

78.     Defendant designed its scheme in such a manner as to obscure and conceal from advertisers that they were being wrongfully charged for hijacked direct traffic.   The statutes of

20

limitation for all causes of action expressed herein are tolled by virtue of Defendant's fraudulent concealment.

## SECOND COUNT
### DECEIT

79.    By hijacking direct traffic and then falsely reporting the hijacked direct traffic as click-through traffic, Defendant wrongfully and willfully caused QuiBids to be deceived concerning the number of conversions generated by Defendant for which QuiBids owed CPA fees.

80.    Defendant falsely reported hijacked direct traffic as click-through traffic generated by Defendant for the express purpose of increasing Defendant's revenues.

81.    QuiBids suffered harm due to Defendant's deceit.

## THIRD COUNT
### NEGLIGENCE

82.    Defendant owed and continues to owe a duty to abstain from injuring QuiBids and its property.

83.    In the circumstances of this case, an ordinary and prudent person would recognize that if he or she did not act with ordinary care and skill in regard to the displaying of advertising, the handling of direct traffic, the reporting of traffic, and/or the hijacking and false reporting of direct traffic, that he or she may cause danger or injury to others.

84.    It was clearly foreseeable to Defendant that QuiBids and other similarly situated advertisers would be harmed by Defendant's false reporting of hijacked direct traffic as click-through traffic and by Defendant's hijacking of traffic directed to QuiBids and routing that traffic instead to one of QuiBids' competitors.

85.    Defendant had complete, exclusive control over the creation and design of its Shopping Toolbar and whether it would hijack direct traffic.

86.     Defendant had complete, exclusive control over how Defendant would report the direct traffic hijacked by its Shopping Toolbar.

87.     Misrepresenting hijacked direct traffic as click-through traffic is an injury causing event that ordinarily does not occur in the absence of negligence (or intentional action) on the part of an advertising publisher/affiliate marketer such as Defendant.

88.     Rerouting traffic to a competitor's website is an injury causing event that ordinarily does not occur in the absence of negligence (or intentional action) on the part of an advertising publisher/affiliate marketer such as Defendant.

89.     Defendant was in a superior position to protect and guard against the hijacking of direct traffic and false reporting thereof.

90.     Defendant failed to exercise ordinary care with respect to the treatment of direct traffic and the reporting of its services.

91.     QuiBids was harmed by Defendant's failure to exercise ordinary care because (1) QuiBids was charged for conversions that Defendant did not, in fact, procure for QuiBids, and (2) QuiBids was deprived of sales, revenues, and customers.

92.     Defendant's actions as set forth herein were a direct cause of harm to QuiBids.

## FOURTH COUNT
## NEGLIGENCE PER SE

93.     The actions of Defendant constitute the attainment of property by trick or deception in violation of 21 O.S. § 1541.1.

94.     The actions of Defendant constitute the attainment of property by false pretenses in violation of 21 O.S. § 1542(A).

95.     The actions of Defendant constitute larceny in violation of 21 O.S. §§ 1701, 1704.

96.     The actions of Defendant constitute a violation of the Oklahoma Computer

Crimes Act, 21 O.S. § 1953.

97.    The actions of Defendant constitute a violation of the Oklahoma Consumer Protection Act, 15 O.S. §§ 751-765.

98.    The actions of Defendant constitute a violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

99.    The actions of Defendant constitute Federal wire fraud in violation of 18 U.S.C. § 1343.

100.    Defendant's violation of these statutes was the direct cause of injury to QuiBids and constitutes negligence per se.

### FIFTH COUNT
### UNJUST ENRICHMENT

101.    Defendant has unjustly received money, ultimately flowing from QuiBids, for purportedly sending new traffic (i.e. customers and/or new transactions from existing customers) to QuiBids that Defendant did not, in fact, procure for QuiBids.

102.    Defendant wrongfully, willfully, recklessly, and/or unjustly intercepted direct traffic from QuiBids' new or existing customers and reported that hijacked direct traffic as having been procured as click-through traffic from Defendant.

103.    Defendant has, heretofore, retained a benefit that it unjustly received at the expense of QuiBids.

104.    Defendant has money in its hands that, in equity and good conscience, it should not be allowed to retain.

### SIXTH COUNT
### RESTITUTION

105.    Based on the allegations set forth herein, QuiBids is entitled to restitution in-full from Defendant.

## SEVENTH COUNT
## MONEY HAD AND RECEIVED

106.    Based on the allegations set forth herein, Defendant has received money which, in equity and good conscience, should be returned in-full to Plaintiff.

## EIGHTH COUNT
## DISGORGEMENT

107.    Defendant's scheme and conduct were deliberate and wrongful.

108.    Defendant's scheme and wrongful conduct resulted in harm to QuiBids.

109.    Defendant's Shopping Toolbar exhibited a uniform behavior that resulted in the same or similar harm to many other advertisers in addition to QuiBids.

110.    Because of Defendant's wrongful conduct, and because the nature of Defendant's scheme conceals the wrongfully hijacked traffic from the legitimate click-through traffic, all of Defendant's revenues attributable to QuiBids should be disgorged.

## NINTH COUNT
## TORTIOUS INTERFERENCE

111.    QuiBids had a business and contractual right to not be charged by the affiliate networks with whom it contracts for fraudulent or invalid traffic.

112.    QuiBids had a business and contractual right to good faith and fair dealing from the affiliate networks with whom it contracts.

113.    Defendant maliciously and wrongfully interfered with QuiBids' business and contractual relationships with the affiliate networks with whom it contracts by falsely reporting to the affiliate networks traffic that Defendant had not, in fact, procured for QuiBids.

114.    QuiBids had a business and contractual right to receive traffic, sales, revenues and customers from computer users who were attempting to reach QuiBids.com.

115.    Defendant maliciously and wrongfully interfered with QuiBids' business and

contractual relationships with the customers and potential customers who were attempting to reach QuiBids.com, but were redirected by Defendant's malware to one of QuiBids' competitors.

116. Defendant's conduct directly harmed QuiBids by causing QuiBids to be charged for hijacked direct traffic that was not procured by Defendant or any other advertiser and by depriving QuiBids of traffic, sales, revenues and customers.

### TENTH COUNT
### MALICIOUS WRONG

117. Defendant intentionally intercepted direct traffic headed to QuiBids.com and caused that direct traffic to reroute through Defendant's servers, before directing it to its originally intended destination of QuiBids.com.

118. Defendant then reported this hijacked direct traffic as click-through traffic to increase Defendant's revenues at the expense of QuiBids.

119. Defendant also intentionally intercepted traffic headed to QuiBids.com and caused that traffic to reroute through Defendant's servers, before directing it instead to one of QuiBids' competitors.

120. Defendant's conduct directly harmed QuiBids by causing QuiBids to be charged for hijacked direct traffic that was not procured by Defendant or any other advertiser and by depriving QuiBids of traffic, sales, revenues and customers.

### ELEVENTH COUNT
### CONVERSION

121. Defendant designed a scheme whereby Defendant would (1) intercept direct traffic intended for QuiBids.com, (2) reroute the hijacked direct traffic through Defendant's server and then through an affiliate link to cause it to appear to QuiBids as if the traffic originated from Defendant's website and/or advertisements published by Defendant, (3) report that hijacked direct traffic as click-through traffic procured by Defendant, (4) thereby causing

QuiBids to pay for that traffic, to (5) wrongfully increase Defendant's revenues.

122.    Defendant's scheme was intentional.

123.    QuiBids did not consent to being wrongfully and fraudulently charged for hijacked direct traffic – i.e. traffic that was not actually procured for it by Defendant.

124.    Defendant's conduct directly harmed QuiBids by causing QuiBids to be charged for hijacked direct traffic that was not procured by Defendant or any other advertiser.

### TWELFTH COUNT
### EQUITABLE ESTOPPEL

125.    Defendant misrepresented or concealed facts regarding its scheme to hijack direct traffic intended for QuiBids.com and reroute that traffic through Defendant's servers and then through an affiliate link in order to receive revenue, ultimately from QuiBids, for traffic that Defendant did not procure.

126.    Defendant had knowledge of the true facts of its scheme at the time affiliate marketing networks for QuiBids and other merchants transacted with Defendant to use the services of ShopAtHome.com with the hope to drive additional traffic to QuiBids.com (and the websites of other merchants).

127.    Defendant had the intent to defraud QuiBids and other merchants by falsely reporting direct traffic as traffic procured by Defendant.

128.    QuiBids was induced to, and in-fact relied upon, the express or implicit representation that QuiBids would only be charged for conversions that occurred as a result of traffic genuinely procured by Defendant.

129.    QuiBids unknowingly made payments for conversions resulting from hijacked direct traffic.

130.    QuiBids suffered direct and indirect harm to its business as a result of its reliance

upon Defendant's express and implicit representations to QuiBids and/or the industry at large.

131.   Defendant's knowledge of its fraudulent scheme was not disclosed to QuiBids at any time during which QuiBids was being billed for fraudulent conversions, i.e. conversions that Defendant did not, in fact, procure.

### THIRTEENTH COUNT
### 18 U.S.C. § 1030
### (COMPUTER FRAUD AND ABUSE ACT)

132.   Defendant knowingly, and with an intent to defraud advertisers, engineered its Shopping Toolbar to intercept traffic directed to its advertisers and reroute that traffic though Defendant's servers and then through an affiliate link in order for Defendant to be able to report that hijacked traffic as if it originated from Defendant's website or an advertisement published by Defendant.

133.   Defendant's malware also at times reroutes traffic intended for QuiBids.com to the website of one of QuiBids' competitors.

134.   Tampering with URL's for merchants such as QuiBids.com, that users of the Shopping Toolbar enter directly into the address fields of their web browsers, exceeds the scope of authorized access permitted by the users.

135.   The Terms and Conditions posted on ShopAtHome.com provide: "When you visit a website, whether typing in the URL, or clicking a link (including from a search engine results page), the Shopping Toolbar recognizes whether the URL is that of an Affiliate Store, and, if so, may redirect you through the affiliate network site to the Affiliate Store's website, at which time, a tracking cookie will be placed in your browser."[15]

---

[15] (http://www.ShopAtHome.com/sahpages/terms-and-conditions.aspx last visited 2/14/2013.)

136.    QuiBids.com is not an "Affiliate Store" as that term is defined in the Terms and Conditions of ShopAtHome.com.  Accordingly, Defendant was not authorized by Defendant's users to redirect traffic intended for QuiBids.com, and in no event was Defendant authorized by QuiBids to hijack direct traffic intended for QuiBids.com.

137.    Moreover, in no instance was Defendant authorized by Defendant's users to redirect traffic intended for QuiBids.com to the website of one of QuiBids' competitors.

138.    By virtue of intercepting and rerouting what would have been direct traffic to QuiBids.com and other retailers, Defendant has furthered its fraud described elsewhere herein.

139.    Defendant's conduct directly harmed QuiBids by causing QuiBids to be charged for hijacked direct traffic that was not procured by Defendant or any other advertiser and by depriving QuiBids of traffic, sales, revenues and customers.

140.    The computers owned by users of Defendant's Shopping Toolbar are "protected computers," as they are used in such a manner to affect interstate or foreign commerce or communication.

### FOURTEENTH COUNT
### 15 O.S. §§ 751-765
### (CONSUMER PROTECTION ACT)

141.    Defendant engaged in unlawful deceptive trade practices, which caused QuiBids to be deceived and misled to its detriment before, during and after the transactions in which Defendant charged CPA fees for hijacked traffic.

142.    Defendant engaged in unlawful and unfair trade practices by offending established public policy and acting immorally, unethically, oppressively, unscrupulously and substantially injuriously toward QuiBids, as described elsewhere herein.

143.    Defendant's deceptive and unfair trade practices occurred in the regular course of its business.

144.   QuiBids suffered severe monetary injury solely because of Defendant's deceptive and unfair trade practices.

145.   Defendant's deceptive and unfair trade practices were the proximate and direct causes of QuiBids' severe monetary injury.

146.   Because of the harm caused to it by Defendant's deceptive and unfair trade practices, QuiBids is entitled to recover its monetary damages from ShopAtHome.com, including but not limited to all of its attorneys' fees and costs.

147.   Because of the unconscionable harm caused to it by Defendant's deceptive and unfair trade practices, QuiBids is entitled to recover a civil penalty from ShopAtHome.com for each and every instance of a hijack and redirect.

**FIFTEENTH COUNT**
**PUNITIVE DAMAGES**

148.   Defendant acted in reckless disregard of the rights of QuiBids and/or acted intentionally with malice towards QuiBids.

149.   Defendant's actions were without just cause or excuse.

150.   Plaintiff is entitled to punitive damages.

**SIXTEENTH COUNT**
**DECLARATORY JUDGMENT**

151.   Based on the allegations set forth herein, QuiBids is entitled to a judgment declaring that (1) Defendant's Shopping Toolbar is wrongfully intercepting and hijacking direct traffic to QuiBids.com, (2) Defendant's act of charging for intercepted and hijacked direct traffic as if it was traffic procured for QuiBids by Defendant is wrongful, inequitable, and in violation of the law, and (3) Defendant's act of depriving QuiBids of traffic, sales, revenues and customers by hijacking traffic intended for QuiBids and routing it instead to a QuiBids' competitor is wrongful, inequitable and in violation of the law.

29

## SEVENTEENTH COUNT
## INJUNCTIVE RELIEF

152.    To date, Defendant continues to hijack traffic intended for QuiBids.

153.    Based on the allegations set forth herein, QuiBids is entitled to an injunction barring Defendant, through its Shopping Toolbar or otherwise, from intercepting, rerouting, or otherwise interfering with traffic intended for QuiBids.

154.    Based on the allegations set forth herein, QuiBids is entitled to an injunction barring Defendant from hijacking any form of traffic and reporting it as if it was traffic procured by Defendant.

WHEREFORE, QuiBids demands:

(1)    judgment against Defendant for an amount equal to QuiBids' actual damages, the total amount of which is presently concealed by Defendant's actions;

(2)    that Defendant be ordered to disgorge all its revenues attributable to QuiBids;

(3)    judgment against Defendant for punitive damages;

(4)    judgment against Defendant for civil penalties;

(5)    declaratory and injunctive relief as set forth herein;

(6)    judgment for costs, including expert witness fees and attorney fees; and

(7)    such other and further relief as may be just and equitable.

## JURY DEMAND

QuiBids demands a trial by jury.

Respectfully submitted,

_____
Gregory T. Metcalfe, OBA # 19526
Jake Krattiger, OBA # 30617
**GABLEGOTWALS**
One Leadership Square, 15th Fl.
211 North Robinson
Oklahoma City, OK  73102-7101
(405) 235-5500 | (405) 235-2875 (fax)
GMetcalfe@GableLaw.com
JKrattiger@GableLaw.com

**Attorneys for Plaintiffs QuiBids, LLC,
and QuiBids Holdings, LLC**

## EXHIBIT 1
### Close-up Views of Browser Windows

**Fig. 1**



**Fig. 2**



1

# EXHIBIT 1
## Close-up Views of Browser Windows

**Fig. 3.1**



First re-direct of hijacked traffic.

**Fig. 3.2**



Second re-direct of hijacked traffic.

**Fig. 3.3**



QuiBids.com finally accessed, but the user "lands" on ShopAtHome's affiliate link, which is used to register the traffic as having originated from ShopAtHome's advertising efforts.

## EXHIBIT 1
## Close-up Views of Browser Windows

**Fig. 4.1**



Shopping Toolbar has been disabled.

"Add-Ons" such as the Shopping Toolbar are disabled by the user.

**Fig. 4.2**



The direct traffic to QuiBids.com was still redirected through ShopAtHome.com's servers, ultimately to land on Defendant's affiliate link.

The ShopAtHome.com "Coupons and Cash Back" banner ad appears without user prompt.

**EXHIBIT 1**
**Close-up Views of Browser Windows**

**Fig. 5.1**



ShopAtHome.com first loads a frameset. The traffic is then routed through ShopAtHome's servers, with the user finally landing on the affiliate link by which ShopAtHome.com registers having sent the traffic.

5

**EXHIBIT I**

Close-up Views of Browser Windows

**Fig. 5.2**



21 March 2013

PPX
Attn: Legal Department
372 Richmond St. West, Unit 111
Toronto, Ontario
M5V 1X6
CANADA

RE: QuiBids

Dear Sir or Madam:

We have received a draft complaint against ShopAtHome.com from QuiBids LLC and QuiBids Holdings LLC, making a variety of allegations related to the promotion of the QuiBids offer on ShopAtHome.com. The letter from QuiBids and draft complaint are attached.

This letter shall serve as formal notice of this claim, and demand for defense and indemnification related to the claim.

I will be out of the office from March 25 through March 28, but I look forward to speaking with you upon my return.

Sincerely,

Cheryl C. Burton
General Counsel

Encl.

16/11 2010  15:49                                                                    #1039 P.001/003



**Belcaro Group, Inc.**
**Insertion Order**

| | General Contact | | Billing Contact |
|---|---|---|---|
| Contact Person | Geri Gigante | | Patty Gustner |
| Phone | 303-843-0302  ext 107 | | 303-843-0302  ext 121 |
| Fax | 303-843-0377 | | 303-843-0377 |
| Email | ggigante@shopathome.com | | pgustner@belcarogroup.com |
| Address | 7100 E Belleview Ave Suite 208 | | 7100 E Belleview Ave  Suite 208 |
| City | Greenwood Village | | Greenwood Village |
| State | CO | | CO |
| Zip | 80111 | | 80111 |

**Client Contact Information:**

| | General Contact | | Accounting Contact |
|---|---|---|---|
| Corporate Name | PPX | | PPX |
| Contact Person | Tobiah Blackwood | | Lurell Blackwood |
| Phone | 4165983030 | | 4165983093 |
| Fax | 4165983038 | | 4165983038 |
| Email | tobi@ppx.com | | lurell@ppx.com |
| Address | 372 richmond st west unit 111 | | 372 richmond st west unit 111 |
| City, State, Zip | Toronto, Ont m5v 1x6 | | Toronto, Ont m5v 1x6 |
| Country | Canada | | Canada |

CLIENT agrees to the following rate structure:

☒ ___ $40  Flat Fee per bounty/lead/quote
☐ _____  Revenue Share of consumer purchases
☐ _____  Cost Per Click (CPC)

CLIENT agrees to the following media/promotional types:

Media:
☒ All SAH Media
☐ Email Only
☐ Search Only
☐ Web (Text Link & Banner Only)

Promotional Type:
☐ All SAH Traffic
☐ Incentivized Traffic Only
☒ Non-Incentivized Traffic Only

**Tracking URL:** http://securedjump.com/tracking/jumplink/index/?j=TmUh6j&subid=asath-cqui-gcpa-d[SUBID]

**Keywords/Search Terms:**  Search terms that will help customers find your offer online. *(Maximum of 50 – please attach a separate sheet)*

**Copy:  Short** = 200 characters of copy describing your website and **Long** = 400 characters of copy describing your website... Excluding incentive or headlines *(Please attach a separate sheet)*

**Creative:  Banners** = 468 X 60, 88 X 31
           **Logo** = 88 x 31

**Special Instructions:**  *Tracking URL  and  copy  sent  via  email.*

This Insertion Order is subject to the Terms and Conditions attached.  In the event of any inconsistency or conflict, this IO shall prevail.

Accepted for CLIENT by: *PPX*                           DATE: *11/16/2010*

Print Name and Title: *Tobiah Adam   –Media Buyer*

Accepted for Belcaro*Group*, Inc. by: *[signature]*            DATE: *17  Nov 2010*

Print Name and Title: *C. Braunstein, VP*

BelcaroGroup, Inc. ◆ 7100 E. Belleview Avenue, #208 ◆ Greenwood Village, CO 80111
Tel 303-843-0302 ◆ Fax 303-843-0377 ◆ E-mail sales@belcarogroup.com

# Belcaro Group, Inc.
## Master Terms and Conditions

Advertiser and Belcaro Group, Inc ("BGI") agree to the following:

1. **Media Placement.** BGI shall promote Advertiser's offers ("Offers"), including both Advertiser's direct offers as well as offers for which Advertiser is acting on behalf of third party advertising agencies, marketers and others (collectively, "Marketers") in BGI media ("Media") pursuant to the terms set forth in these Master Terms and Conditions and the accompanying IO (collectively, the "Agreement"). In the event of a conflict between the Master Terms and Conditions and the IO, the terms in the IO shall control.

2. **License.** Advertiser, on behalf of itself and its Marketers, grants BGI a limited license to promote the Offers in Media and in BGI press releases and/or collateral material. BGI reserves the right to refuse advertising for any Media for any reason.

3. **Payment.** Advertiser agrees to pay all amounts due BGI within 30 days from the end of the month following the month during which such revenue amounts were earned. Amounts not paid within this timeframe shall be subject to interest at a rate of 1.5% per month or the highest rate permitted by law. In the event that Advertiser fails to timely pay amounts due to BGI, Advertiser shall be liable for all costs of collection, including but not limited to attorney fees and court fees. BGI reserves the right to offset amounts due Advertiser (if any) against amounts Advertiser has failed to pay BGI.

4. **Creative.** BGI shall have the right to modify creative content supplied by Advertiser to meet BGI production and/or other requirements.

5. **Representations and Warranties.**

   a. Advertiser and BGI represent and warrant that at all times they will comply with all applicable federal, state, local and foreign laws, rules and regulations, including but are not limited to the CANSPAM Act of 2003, as such may be amended from time to time.

   b. Advertiser represents and warrants that it or its Marketers own all necessary intellectual property rights and/or licenses for the content supplied to BGI for use in BGI Media and that BGI's use of the content pursuant to this Agreement will not infringe on any third party's copyright, patent, trademark or other intellectual property or privacy rights.

   c. Advertiser represents and warrants that the content supplied to BGI shall not contain any pornographic, libelous, hate-related or otherwise objectionable material and will not contain any links that will bring users to sites with objectionable content. BGI represents and warrants that its web site does not contain any pornographic, libelous, hate-related or otherwise objectionable material and will not contain any links that will bring users to sites with objectionable content.

   d. Advertiser represents and warrants that it has the authority (either directly or obtained from one or more Marketers) to engage BGI to promote the Offers provided for herein and to agree to the terms and conditions of this Agreement.

6. **Toolbar.** Advertiser acknowledges that BGI has a downloadable toolbar application ("Toolbar") which users choose to download for, among other things, using the Toolbar Search Box for identifying coupons and cash back offers available on BGI's web site, for being alerted to time-sensitive promotions and web site specials, and for the convenience of the Toolbar redirecting the users to the users' selected Offer via BGI's site. Advertiser, on behalf of itself and the Marketers, hereby approves BGI's use of the Toolbar to promote the Offers. See http://www.shopathome.com/pages/end-user-license-agreement.aspx for the Toolbar EULA.

7. **Incentives.** Advertiser acknowledges the fact that BGI's web site at www.shopathome.com is a cash back loyalty incentive site and that merchant offers are often incentivized. BGI will not incentivize Advertiser's Offers without receiving Advertiser's prior written consent to do so.

8. **Indemnification.** Advertiser agrees to defend, indemnify and hold harmless BGI and its officers, directors, employees and agents from any and all claims, losses, liabilities, damages, costs and expense of any nature (including reasonable attorneys fees) relating to or arising out of (a) the promotion and distribution of the Offers;

(b) any and all copy and images supplied by Advertiser and BGI's use thereof; and (c) Advertiser's breach of this Agreement.

9.  **Customer Information.** Advertiser has the right to use BGI provided customer information ("Data") for (a) its own unlimited e-mailing purposes; and (b) enhancing its customer/prospect databases. Data includes all customer information that has been provided to BGI, whether provided directly from the customer or otherwise. BGI retains all ownership in Data subject to Advertiser's right of use as set forth herein.

10. **Limitation of Liability.** BGI'S AD SPACES, SERVICES AND SITES ARE PROVIDED "AS IS" AND BGI DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS, STATUTORY, OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT, AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. EXCEPT FOR ADVERTISER'S INDEMNIFICATION OBLIGATIONS SET FORTH ABOVE, IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER PARTY OR TO ANY THIRD PARTY CLAIMING THROUGH SUCH PARTY EXCEED THE TOTAL AMOUNT PAID TO BGI BY ADVERTISER HEREUNDER OVER THE MOST RECENT TWELVE (12) MONTH PERIOD.

11. **Disclaimer of Warranties.** ALL SERVICES PROVIDED BY BGI ARE PROVIDED ON AN "AS IS" BASIS. BGI MAKES NO WARRANTIES, GUARANTEES, REPRESENTATIONS, PROMISES, STATEMENTS, ESTIMATES, CONDITIONS OR OTHER INDUCEMENTS; EXPRESS, IMPLIED, ORAL, WRITTEN OR OTHERWISE EXCEPT AS EXPRESSLY CONTAINED IN THIS AGREEMENT.

12. **Governance.** The laws of Colorado and applicable federal U.S. laws shall govern this Agreement.  The parties agree that any claims, legal proceedings or litigation arising in connection with the Agreement will be brought solely in the state and federal courts located in Denver, Colorado and the parties consent to the jurisdiction of such courts.  The parties further agree that service of process may be made by certified mail.

13. **Termination.** Either party may terminate this Agreement by providing the other party with five business days written notice of termination. Notwithstanding the foregoing, BGI may terminate this Agreement immediately without notice if Advertiser is in breach of any representation, warranty or other provision of this Agreement.  The rights and obligations contained in Paragraphs 3, 5, 8-13, and 15 shall survive the termination or expiration of this Agreement.

14. **Assignment.** Either party may assign its rights or delegate its duties in connection with a sale of all or substantially all of such party's assets or other form of transaction in which there is a change of ownership control of such party.

15. **Amendments.** This Agreement constitutes the entire agreement of the parties with respect to the subject matter and supersedes any and all terms and conditions and agreements that Advertiser or Marketers may post online or otherwise (including any terms and conditions that BGI may be required to consent to online after the date hereof in order to participate in Advertiser's or Marketers' programs) as well as previous communications, representations, understandings, and agreements, either oral or written, between the parties.  No future amendment or modification of this Agreement and no restatement or replacement agreement will supersede this Agreement unless it is made in writing and manually, not electronically, signed by each of the parties.

The undersigned warrants that he/she is authorized to bind Advertiser to this Agreement.

Advertiser Corporate Name: _PPX_

Accepted for Advertiser by: _Tobias Aden_     Date: _11/16/2010_

Print Name and Title: _Tobias Adam — Media Buyer_

Accepted for Belcaro Group, Inc. by: _C. Braunstein BGI 17 Nov 2010_

Print Name and Title: _C. Braunstein, VP_

BelcaroGroup, Inc. • 7100 E. Belleview Avenue, #208 • Greenwood Village, CO 80111
Tel 303-843-0302• Fax 303-843-0377• e-mail sales@belcarogroup.com